United States Court of Appeals,

Fifth Circuit.

No. 95-10048.

SEVEN-UP CO., Plaintiff-Appellant,

v.

COCA-COLA CO., Defendant-Appellee.

July 8, 1996.

Appeal from the United States District Court for the Northern District of Texas.

Before GARWOOD, EMILIO M. GARZA and DENNIS, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

The Seven-Up Company sued the Coca-Cola Company under the Lanham Act, alleging that Coca-Cola had a used false and misleading promotional presentation to convince several independent bottlers to cease distributing the soft drink 7UP and to begin distributing Sprite, a Coca-Cola product. At trial, a jury found that the presentation was false and misleading, and that it was a substantial factor in causing two bottlers to switch from 7UP to Sprite. The magistrate judge, concluding that Seven-Up had failed to present sufficient evidence from which the jury could reasonably draw the causal inference, set aside the jury's damages award and granted judgment as a matter of law in favor of Coca-Cola. Seven-Up now appeals, and we affirm.

I

Coca-Cola and Seven-Up both make syrup concentrates for various carbonated soft drinks. Both companies distribute their products through independent bottling companies. These bottling companies purchase the syrup concentrates from the soft drink company, combine it with carbonated water and a sweetener, and then package the final soft drink product in bottles and cans for distribution. As a general industry practice, a bottling company will agree with a soft drink company not to distribute within a given geographical area more than one brand in any flavor category of the soft drink market. For example, the independent bottler will agree to distribute only a single brand of "cola" soft drink, such as Coca-Cola, Pepsi or Royal Crown, within a given geographical territory.

Lemon-lime soft drinks constitute the second largest selling flavor category in the soft drink market. Sprite and 7UP are both lemon-lime flavored carbonated soft drinks. Seven-Up began distributing soft drinks in the 1920's, and by the time Coca-Cola introduced Sprite in 1961, 7UP sales dominated the lemon-lime soft drink category. In the following years, Seven-Up suffered a significant decline in market share, and by 1991, Sprite and 7UP were close competitors in the lemon-lime soft drink market category.

In 1991, Coca-Cola executives began developing a sales presentation that became known as "The Future Belongs to Sprite." The presentation materials consisted of charts, graphs and overhead projection displays comparing the relative sales and market share performance of Sprite and 7UP between 1980 and 1990. Although most of the data was national in scope, versions of the presentation were tailored to address sales statistics in an individual bottler's territory. "The Future Belongs to Sprite" had specifically been developed to target the seventy-four "cross franchise" bottlers that distributed 7UP along with Coca-Cola products other than Sprite. None of these "cross franchise" bottlers distributed Sprite in the same geographical territory as 7UP.

Coca-Cola eventually presented part or all of "The Future Belongs to Sprite" to eleven of the "cross franchise" bottlers in the course of ongoing discussions aimed at convincing them to switch from 7UP to Sprite. Of the eleven bottlers, five decided to switch their lemon-lime brand. Seven-Up subsequently filed suit under the Lanham Act, alleging that Coca-Cola had convinced the five independent bottlers to switch brands by means of false and misleading comparisons found in "The Future Belongs to Sprite." At the close of evidence, the magistrate judge ruled as a matter of law that one of the five bottlers did not switch brands on account of anything false or misleading in Coca-Cola's presentation materials. Seven-Up's claims as to the remaining four bottlers were submitted to the jury. After deliberating, the jury concluded that the presentation materials were false and misleading, and that they were a substantial factor in causing two of the bottlers to switch from 7UP to Sprite. Acting upon a motion by Coca-Cola, the magistrate judge concluded that Seven-Up had presented insufficient evidence on the issue of causation and therefore granted judgment as a matter

of law in favor of Coca-Cola.[1]  Seven-Up filed a timely notice of appeal.

## II

We must first address whether the Seven-Up Company properly stated a claim for false advertising or promotion under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[2]  The Lanham Act was enacted "to protect persons engaged in such commerce against unfair competition."  15 U.S.C. § 1127.  Section 43(a) of the Lanham Act provides in relevant part that:

> Any person who ... in *commercial advertising or promotion,* misrepresents the nature, characteristics, qualities, or geographic origin of his or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B) (emphasis added).[3]  This section provides protection against a "myriad of deceptive commercial practices," including false advertising or promotion.  *Resource Developers v. Statue of Liberty-Ellis Island Found.,* 926 F.2d 134, 139 (2d Cir.1991).  Section 43(a) of the Lanham Act has been characterized as a remedial statute that should be broadly construed.  *See Gordon & Breach Science Publishers v. American Inst. of Physics,* 859 F.Supp. 1521, 1532

---

[1]The magistrate judge did enter judgment on the jury's finding that the presentation materials were false and misleading, and were likely to deceive the independent bottlers.  This finding is only one element of a cause of action under § 43(a), *see infra* note 3, and Coca-Cola does not cross-appeal from this part of the judgment.

[2]In its brief, Coca-Cola disingenuously suggests that we can *affirm* the *judgment* entered by the magistrate judge on the grounds that the allegedly false or misleading materials did not constitute "advertising" within the meaning of the Lanham Act.  Clearly, if Seven-Up's allegations do not fall under the Lanham Act, we would be required to instruct the magistrate judge to *vacate* his judgment and *dismiss the suit for failure to state a claim.*

[3]Courts have summarized the basic elements a plaintiff must allege in an action under § 43(a) as follows:

> (1) that the defendant has made false or misleading statements as to his own product or another's;  (2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience;  (3) that the deception is material in that it is likely to influence purchasing decisions;  (4) that the advertised goods travelled in interstate commerce;  and (5) that there is likelihood of injury to the plaintiff in terms of declining sales, loss of goodwill, etc.

*Ditri v. Coldwell Banker Residential Affiliates, Inc.,* 954 F.2d 869, 872 (3d Cir.1992) (internal brackets and citation omitted).  In this case, only the first element is in dispute.  As discussed below, we must determine whether Coca-Cola may be said to have made false or misleading statements in the context of "commercial advertising or promotion."

(S.D.N.Y.1994) (citing cases).

Some courts have suggested that Congress passed the Lanham Act in order to protect consumers generally. *See, e.g., Wojnarowicz v. American Family Ass'n,* 745 F.Supp. 130, 141 (S.D.N.Y.1990).[4] However, most courts that have addressed the issue agree that in light of the pro-competitive purpose language found in § 45, "consumers fall outside the range of "reasonable interests' contemplated as protected by the false advertising prong of Section 43(a) of the Lanham Act." *Serbin v. Ziebart Intern. Corp.,* 11 F.3d 1163, 1177 (3d Cir.1993).[5] These courts have interpreted the primarily pro-competitive purpose of § 43(a) to mean that "[s]uit may be brought only by a commercial plaintiff who can prove that its interest have been harmed by a competitor's false advertising." *Gordon & Breach,* 859 F.Supp. at 1533 (citing cases); *see also Serbin,* 11 F.3d at 1177 (holding that only commercial plaintiffs or consumers with some discernible competitive injury have standing to sue under the Act).

There is no dispute in this case that Seven-Up is a commercial plaintiff who alleges an injury caused by a competitor. Rather, in determining whether Seven-Up has properly stated a claim under the Lanham Act, our focus is solely on the issue of whether the Coca-Cola presentation falls within the meaning of "commercial advertisement or promotion" under the Act. The Lanham Act does not define either "advertising" or "promotion." Nor is the Act's legislative history helpful regarding this

---

[4]*See also Vidal Sassoon, Inc. v. Bristol-Myers Co.,* 661 F.2d 272, 277 (2d Cir.1981) (noting "the clear purpose of Congress in protecting the consumer").

[5]*See also Colligan v. Activities Club of New York, Ltd.,* 442 F.2d 686, 692 (2d Cir.) ("The Act's purpose, as defined in § 45, is exclusively to protect the interests of a purely commercial class against unscrupulous commercial conduct."), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971). Some courts have criticized the "purely commercial class" language in *Colligan* and have indicated that under certain circumstances, indirect or even non-competitors may also have standing under the Lanham Act. *See, e.g., Waits v. Frito-Lay, Inc.,* 978 F.2d 1093, 1108 (9th Cir.1992) (concluding that plaintiff must have "reasonable interest" to be protected against false advertising), *cert. denied,* 506 U.S. 1080, 113 S.Ct. 1047, 122 L.Ed.2d 355 (1993). However, we have found no case which suggests that "consumers" as such have standing under § 43(a). *See generally* James S. Wrona, False Advertising and Consumer Standing under Section 43(a) of the Lanham Act: Broad Consumer Protection Legislation or a Narrow Pro-Competitive Measure?, 47 Rutgers L.Rev. 1085 (1995) (concluding that recent developments have brought most courts into agreement that consumers do not have standing to sue, although various rationales are still employed).

issue; it addresses only the requirement that the advertising or promotion be "commercial" in nature.[6]

Courts have noted that we should give the terms "advertising" and "promotion" their "plain and ordinary meanings." *American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc.,* 820 F.Supp. 1072, 1077 (N.D.Ill.1993); *see also Alfred Dunhill Ltd. v. Interstate Cigar Co.,* 499 F.2d 232, 236 (2d Cir.1974) ("[N]otwithstanding that § 43(a) applies to a broad range of misrepresentations, it does not have boundless application ... but is limited to false advertising as that term is generally understood.") (internal quotation marks omitted). The courts are also in agreement, however, that "the Act's reach is broader than merely the "classic advertising campaign.' " *Gordon & Breach,* 859 F.Supp. at 1534 (citing cases). In *Gordon & Breach,* the court summed up the principles found in the case law and the Act's legislative history as follows:

> In order for representations to constitute "commercial advertising or promotion" under Section 43(a)(1)(B), they must be: (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classical advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

859 F.Supp. at 1535-36. We find this summary of the requirements for establishing "commercial advertising or promotion" under § 43(a) of the Lanham Act to be both accurate and sound.

In applying these criteria to our case, the issues we must address are (1) whether Coca-Cola's presentation was made "for the purpose of influencing *consumers* to buy defendant's goods" and (2) whether the presentation was "*disseminated sufficiently* to the relevant purchasing public" within the

---

[6]The "commercial" requirement was inserted to ensure that § 43(a) does not infringe on free speech protected by the First Amendment. *See* 135 Cong.Rec. H1216-17 (daily ed. April 13, 1989) (statement of Rep. Kastenmeier) ("[T]he proposed change in section 43(a) should not be read in any way to limit political speech, consumer or editorial comment, parodies, satires, or other constitutionally protected material.... The section is narrowly drafted to encompass only clearly false and misleading commercial speech."); 134 Cong.Rec 31,851 (Oct. 19, 1988) (statement of Rep. Kastenmeier) (commenting that the reach of Section 43(a) "specifically extends only to false and misleading speech that is encompassed within the "commercial speech' doctrine developed by the United States Supreme Court"). *See generally Gordon & Breach,* 859 F.Supp. at 1533-34 (discussing the legislative history of the Lanham Act). We do not perceive, nor do the parties argue, that applying § 43(a) to the Coca-Cola presentation would raise any potential First Amendment issues. The presentation is clearly "commercial" in nature, and we therefore need only address whether it is commercial "advertising" or "promotion" under the Lanham Act.

soft drink industry. In other words, we need to determine whether the "cross franchise" bottlers may be considered "consumers" and "the relevant purchasing public" for purposes of § 43(a). Assuming they may, we must then determine whether the Coca-Cola presentation was disseminated sufficiently to the seventy-four "cross franchise" bottlers, again for purposes of the Act.

Coca-Cola contends that their presentation was not disseminated sufficiently to the "public" to constitute "advertising" under the Lanham Act. The Act, Coca-Cola argues, does not apply to "materials given in individual, face-to-face business meetings with a few local bottlers." We find little support for this argument in the case law. In one of the opinions relied on by Coca-Cola, *American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc.,* the court held that a single letter privately addressed to a *non-consuming licensor* constituted an "isolated individualized written statement" rather than the kind of "public dissemination of information" contemplated by the Act. 820 F.Supp. at 1077-78. The court concluded that to "permit a single private correspondence" to fall within § 43(a) "would sweep within the ambit of the Act any disparaging comment made in the context of a commercial transaction." *Id.* at 1078; *see also Medical Graphics Corp. v. SensorMedics Corp.,* 872 F.Supp. 643, 650 (D.Minn.1994) (holding that statements made by one of a handful of sales representatives to an individual potential customer was not actionable where the potential market for the medical products was large); *Licata & Co. v. Goldberg,* 812 F.Supp. 403, 408 (S.D.N.Y.1993) (concluding that the Lanham Act "would be trivialized if it were applied to statements in oral conversations by an individual sales representative to an individual customer concerning matters which an ordinary listener would recognize as personal opinion, as opposed to representations of hard definable facts, such as product descriptions"); *Marcyan v. Nissen Corp.,* 578 F.Supp. 485, 506-08 (N.D.Ind.1982) (holding that the Act did not apply to statements made in user's manual that was not advertising material, nor distributed to the general public, and which was typically available only after purchase was made), *aff'd,* 725 F.2d 687 (7th Cir.1987).

However, the court in *American Needle,* in holding that the Act did not apply to the single private correspondence in that case, also recognized that "[t]he level of circulation required to constitute advertising and promotion will undeniably vary from industry to industry and from case

to case." 820 F.Supp. at 1078. The court had noted earlier that nothing in the language of § 43(a) specifically requires a false representation be intended "to influence the *ultimate consumer,* whoever that might be." *Id.* at 1077. And, in dicta, the court stated that "public dissemination of false information to retailers at a trade show would most likely constitute "commercial advertising and promotion,' while a single letter privately addressed to a non-consuming licensor does not." *Id.* at 1078; *see also Semco, Inc. v. Amcast, Inc.,* 52 F.3d 108, 114 (6th Cir.1995) (holding that Lanham Act covered defendant's use of reprints of article as promotional brochure at trade shows); *Mylan Laboratories, Inc. v. Pharmaceutical Basics, Inc.,* 808 F.Supp. 446, 459 (D.Md.1992) (concluding that § 43(a) applied to brochures circulated only to wholesalers, physicians, and pharmacists who were not the actual consumers of defendant's products), *rev'd on other grounds,* 7 F.3d 1130 (4th Cir.1993), *cert. denied,* --- U.S. ----, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994).[7]

Accordingly, for purposes of the Lanham Act's definition of "commercial advertising or promotion," both the required level of circulation and the relevant "consuming" or "purchasing" public addressed by the dissemination of false information will vary according to the specifics of the industry. For example, in *National Artists Management Co. v. Weaving,* 769 F.Supp. 1224 (S.D.N.Y.1991), the court stated:

> It is true that defendants' conduct—speaking by telephone with a number of colleagues about the reasons for terminating their relationships with [a theatrical booking company]—is not "commercial advertising and promotion" in the traditional sense of large-scale, nationwide commercial advertising campaigns. In the industry context of the theater-booking industry, however, "services" are "promoted" by word-of-mouth and information is spread through a network of telephone contacts with producers, promoters, and presenters.

769 F.Supp. at 1235. The evidence in *National Artists* established that the defendants were planning to form a company to compete with their former employers. *Id.* at 1234-35. On these facts, the court had no trouble concluding that the Lanham Act applied to the defendants' conduct, at least to the extent that their conversations were "commercial" in nature, and not purely or primarily social calls unrelated to the theater business. *Id.* at 1235-36.

---

[7]In *Birthright v. Birthright, Inc.,* 827 F.Supp. 1114, 1138 (D.N.J.1993), the court concluded that § 43(a) was broad enough to reach false or misleading statements made in the context of non-profit fundraising: "The statements contained in fundraising letters about the services provided by a non-profit organization represent a promotion of those services."

In *Gordon & Breach,* the court held that the terms "commercial advertising or promotion" applied to the actions of a non-profit publisher that had published comparative surveys of scientific journals which, through the use of a misleading rating system, rated its own publications as superior. The court held that while the non-profit organization must be free to publish on any topic without fear of Lanham Act liability, the same did not apply "to subsequent (or, occasionally, prior) promotional uses of that speech." *Gordon & Breach,* 859 F.Supp. at 1544. The court concluded that the misrepresentations had been sufficiently distributed to the relevant purchasing public where preprints were distributed at a librarians' conference and reprints were further distributed to librarians—where librarians "represent the core consumers of those products." *Id.*

Where the potential purchasers in the market are relatively limited in number, even a single promotional presentation to an individual purchaser may be enough to trigger the protections of the Act. In *Mobius Management Sys., Inc. v. Fourth Dimension Software, Inc.,* 880 F.Supp. 1005 (S.D.N.Y.1994), the court held that a single letter from a computer software manufacturer to a potential customer could constitute "commercial advertising or promotion" within the meaning of the Lanham Act. The court explicitly recognized the requirement that "only promotional representations that are directed at the *purchasing public* can be reached by § 43(a)." *Id.* at 1020 (emphasis added). Nevertheless, the court concluded that this promotion had been disseminated sufficiently to the relevant purchasing public, which was "quite small."[8] *Id.* at 1020-21. The court went on to suggest, "[m]oreover, in this case the true relevant purchasing public consisted solely" of the one potential customer, whose impending purchase of a competitor's product spurred the defendant to write the false and misleading letter comparing the two products, in a "last-ditch effort to torpedo" the purchase. *Id.* at 1021.[9] The court reasoned that "to label this behavior as anything but "commercial advertising or promotion' would defeat the broad remedial purposes of the Lanham Act." *Id.*

Drawing on these cases, we conclude that Coca-Cola's presentation, "The Future Belongs

---

[8]The two competitors in *Mobius Management* both marketed software products for customers that use IBM mainframe computers. 880 F.Supp. at 1008.

[9]In contrast, the single communication at issue in *American Needle* was addressed to a *non-consuming licensor. American Needle,* 820 F.2d at 1078.

to Sprite," falls within the meaning of "commercial advertising or promotion" under § 43(a) of the Lanham Act.[10]  Coca-Cola's use of part or all of the presentation materials during negotiations with representatives of the eleven "cross-franchise" bottlers does not constitute merely isolated, individual statements of opinion by a single sales representative to a single customer.  The presentation materials in this case were specifically developed and designed by Coca-Cola to target these independent bottlers and convince them, based on comparative sales statistics, to switch from 7UP to Sprite.  The promotional presentation that was finally developed, "The Future Belongs to Sprite," comprised as it was of various types of documents, including visual aids such as charts, graphs and overhead projections, may only have been shown in its entirety to two bottlers.  Nevertheless, this presentation, even if used only in part, is a far cry from the individualized comments held by some courts to fall outside the meaning of commercial advertising or promotion under the Act.

The product Coca-Cola was promoting by means of "The Future Belongs to Sprite" was the Sprite concentrate, which the independent bottlers would combine with carbonated water and a sweetener to create the final soft drink product for sale to the general public.  At the time "The Future Belongs to Sprite" was created, the seventy-four "cross-franchise" bottlers targeted by the Coca-Cola presentation were the only relevant potential "consumers" or "purchasing public" for this intermediate product.  Coca-Cola presented part or all of "The Future Belongs to Sprite" to representatives of eleven of these "cross-franchise" bottlers.  Based on these facts, we find that the Coca-Cola presentation was specifically intended to influence consumers to buy its product, and we also find that the presentation was disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within the soft drink industry.[11]  Accordingly, we conclude that Seven-

---

[10]Though we draw on the general approach of these cases, we are not expressing our agreement or disagreement with the precise holding or all that is said in any of them.

[11]In part, Coca-Cola's objection to the application of the Lanham Act in this case boils down to the argument that the representatives of the independent bottlers were sophisticated businessmen who were as or more knowledgeable about the soft drink industry than the Coca-Cola representatives making the presentations.  There are two problems with this argument.

First of all, as previously noted, Coca-Cola does not cross-appeal from the judgment entered upon the jury's finding that the presentation was false and misleading, and was likely to mislead the independent bottlers.  In light of this uncontested finding, it

Up has properly stated a claim under § 43(a) of the Lanham Act. This conclusion is consistent with the pro-competitive and broad remedial goals of the Lanham Act.

III

Seven-Up argues that the magistrate judge erred in granting Coca-Cola's motion for judgment as a matter of law. We review the trial court's decision *de novo,* applying the same legal standard the court used below. *Conkling v. Turner,* 18 F.3d 1285, 1300 (5th Cir.1994). Judgment as a matter of law following a jury verdict, formerly referred to as a motion for judgment notwithstanding the verdict, is appropriate if a party has been fully heard by the jury on an issue and "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." FED.R.CIV.P. 50(a). The standard for evaluating whether a court properly granted a Rule 50(a) motion is still governed by our *en banc* opinion in *Boeing v. Shipman:*

> On motions for directed verdict and for judgment not withstanding the verdict, the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion is proper.

411 F.2d 365, 374 (5th Cir.1969) (*en banc* ). In order to reach the jury on an issue, the plaintiff must be able to present more than a "mere scintilla of evidence." *Id.* "There must be a conflict in substantial evidence to create a jury question." *Id.* at 375. In determining whether there is substantial evidence to create a jury question, we are not free to weigh conflicting evidence and inferences, determine the credibility of witnesses, or substitute our judgment of the facts for that of the jury. *Id.;*

---

would be highly incongruous for us to conclude that these independent bottlers, albeit sophisticated and knowledgeable, were, as a matter of law, incapable of being mislead by Coca-Cola's statistical presentations.

Moreover, there is nothing in the legislative history to the Act or in the case law to suggest that the sophistication of the relevant purchasing public is a relevant factor in determining whether § 43(a) properly applies to the advertising or promotion at issue. To the contrary, the cases dealing with promotions made at trade shows and to specialized groups like the librarians in *Gordon & Breach* suggest that § 43(a) applies even to presentations made to the most savvy purchaser. *See, e.g., Mylan Laboratories, Inc. v. Pharmaceutical Basics, Inc.,* 808 F.Supp. 446, 459 (D.Md.1992) (wholesalers, physicians, and pharmacists); *Semco, Inc. v. Amcast, Inc.,* 52 F.3d 108, 114 (6th Cir.1995) (trade show).

*Brock v. Merrell Dow Pharmaceuticals, Inc.,* 874 F.2d 307, 308 (5th Cir.1989), *cert. denied,* 494 U.S. 1046, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990). Nevertheless, where the jury, as in this case, is asked to infer causation based on circumstantial evidence, this Court "must determine whether this is a *reasonable* inference to be drawn from the evidence presented." *Brock,* 874 F.2d at 309 (emphasis in original).

The jury in this case concluded that Coca-Cola's presentation was a substantial factor[12] in causing two of the independent "cross-franchise" bottlers to switch from 7UP to Sprite: the Great Plains Coca-Cola Bottling Company, in Oklahoma City, Oklahoma, and the Nacogdoches Coca-Cola Bottling Company, in Nacogdoches, Texas. We begin with the evidence in the record regarding the Oklahoma bottler.

At trial, Seven-Up presented the testimony of Robert Browne, the Chief Executive Officer and Chairman of the Board of Great Plains. Browne testified that Great Plains had distributed Sprite in nearly all of its territories prior to 1978, when the company began distributing 7UP as the result of a package deal in purchasing Dr. Pepper. He testified that over the years, Great Plains had been considering how to begin distributing Sprite again in those territories, but that Seven-Up would not permit "co-existence," that is, distribution of Sprite in the same territories as 7UP. Browne also testified that the company had decided not to sell its 7UP distributorship because of tax considerations.

In March of 1991, Browne met with representatives of Coca-Cola who presented to him "The Future Belongs to Sprite." At the end of the presentation, Browne requested and received a couple of slides or overlays which he later presented to the bottling company's board of directors. A general agreement in principal was reached at this meeting for Great Plains to begin distributing Sprite, but the terms and conditions of a final agreement between Coca-Cola and Great Plains were not agreed to until four to six weeks later. The final decision to switch to Sprite was made by the board of

_____

[12]*See American Rockwool, Inc. v. Owens-Corning Fiberglas Corp.,* 640 F.Supp. 1411, 1444 (E.D.N.C.1986) ("[I]t is only necessary that plaintiff demonstrate that defendant's illegal conduct was a substantial cause of injury to plaintiff's business. Plaintiff is not required to prove that the defendant's conduct was the only or even the predominant cause of this injury.").

directors of Great Plains.

When asked whether he placed any reliance on the presentation, Browne responded that it was "background information," that he could not "think of any decisions that turned on it," and that he had not relied on it in deciding to introduce Sprite in Oklahoma City. Browne also testified that he was "bored" by the presentation, that he "had seen thousands of these things" before and that it was "just another yawn" to him.

Regarding the Nacogdoches Coca-Cola Bottling Company, Seven-Up presented the testimony of Benjamin F. Ashcroft, Jr., the company's general manager. Ashcroft testified that Coca-Cola had presented "The Future Belongs to Sprite" at a meeting of the board of directors. He also stated that the only two questions he recalls being asked during the presentation were one, whether Coca-Cola would repaint the bottling company's trucks, then emblazoned with 7UP logos, and two, what was to be done with the company's 7UP vending machines. After the Coca-Cola representatives left the meeting, the board of directors spent approximately thirty minutes discussing the proposal before voting to switch from 7UP to Sprite.

Seven-Up did not present any direct evidence that even a single board member of either bottling company relied on or was influenced by any of the material in the Coca-Cola presentation in deciding to switch to distributing Sprite.[13] Instead, Seven-Up argues that the inference to be drawn from the fact that the board witnessed the presentation and then, immediately or within a short period of time, decided to switch soft drinks provides substantial evidence, on its own, to support the jury's verdict on the issue of causation.[14] We disagree. In light of all the evidence and surrounding circumstances, we find the inference that "The Future Belongs to Sprite" was a substantial factor in causing the two bottling companies to switch to Sprite to be unreasonable.

---

[13]Seven-Up incorrectly suggests in its brief that William Casey, President and CEO of Coca-Cola Beverages, Ltd., testified that one of the events which caused the introduction of Sprite in the Oklahoma City market was the Coca-Cola presentation made to Browne. In fact, when asked if he knew what factors caused the introduction of Sprite in the Oklahoma City market, Casey merely testified that he was "aware of meetings" between one of the Coca-Cola representatives and Browne in Oklahoma City.

[14]Seven-Up also presented evidence that prior to 1990, no bottling company distributing 7UP products had ever switched to another brand.

We have previously rejected inferences of causation based solely on the chronology of events, where the record contains undisputed testimony to the contrary or other equally credible theories of causation. *See, e.g., Fenner v. General Motors Corp.,* 657 F.2d 647, 651 (5th Cir. Unit B June 1981) ("An inference may be unreasonable if it is at war with uncontradicted or unimpeached facts.") (internal quotation marks omitted), *cert. denied,* 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982); *Dreijer v. Girod Motor Co.,* 294 F.2d 549, 555-56 (5th Cir.1961) (rejecting an inference of causation based on "post hoc ergo propter hoc reasoning" where the evidence supported several other probable causes for the accident).[15] Seven-Up offered no evidence to contradict the testimony of Browne that he personally did not rely on the presentation in reaching a general agreement with the Coca-Cola representatives, and that he could not think of any decision that turned on the presentation.[16] There was also no evidence presented regarding which parts of the Coca-Cola presentation were shown to the board of directors of Great Plains. The failure to present any evidence as to which specific false and misleading slides or overlays were shown to the board members further underscores the absence of any evidence tending to show that the board in fact relied on information contained in "The Future Belongs to Sprite" much less on anything false or misleading therein.

In contrast, there was substantial evidence presented at trial that the Great Plains bottling

---

[15] "Post hoc ergo propter hoc is not sound logic." *Tampa Times Co. v. NLRB,* 193 F.2d 582, 583 (5th Cir.1952) (noting the presence of uncontradicted testimony in the record that persons responsible for plaintiff's discharge were unaware of his union activities, and concluding that the "inference that he was discharged on account of such activities may not be drawn merely from the fact that the activities preceded the discharge").

[16] Although Browne requested a couple of slides or overlays to present to the Board of Directors of Great Plains, this evidence does not necessarily contradict his claim that he was "bored" by the Coca-Cola presentation in light of the fact that the Board was the final decision-maker regarding whether to switch to Sprite, and Browne was obliged to communicate the contents of the meeting to the board. Seven-Up also argues that because the bottling companies' interests were now tied to Coca-Cola, Seven-Up could not be expected to obtain testimony from the board members that they had relied on the Coca-Cola presentation in making their decision to switch brands. However, economic ties do not necessarily create a jury question as to a witness's veracity. *See Brown v. Ford Motor Co.,* 479 F.2d 521, 523 (5th Cir.1973) (rejecting the argument that economic interests were sufficient to cast doubt on the witness's testimony, where the witness's employer "had been doing a substantial amount of business" with the defendant).

company, which had been considering for years the possibility of distributing Sprite again,[17] and the Nacogdoches bottling company both reached the decision to switch from 7UP to Sprite without regard to anything contained in the Coca-Cola presentation. For example, there was testimony at trial regarding various market conditions bearing on the decision to switch from 7UP to Sprite. Browne testified that Great Plains' 7UP sales had been declining at a rate of about 2.5 percent per year. The president of Seven-Up, Fran Mullin, testified that when he joined the company in 1991, 7UP's market share had been in significant decline for several years. Mullin also testified that the company had developed an adversarial relationship with certain bottlers, and that some bottlers viewed Seven-Up's debt burden as an impediment. In fact, Mullin acknowledged that he had specifically been brought in to deal with the difficulties and turn the company around. When asked why the Nacogdoches bottler switched brands, Ashcroft, the bottling company's general manager, testified that Sprite tasted better, and that they were concerned about 7UP's declining market share and the general financial condition of the Seven-Up company.

When viewed against this general context, we find that an inference of causation based merely on the chronology of events is not a reasonable one for the jury to make. Accordingly, there is insufficient evidence to support the jury's finding that the Coca-Cola presentation was a substantial factor in causing the Oklahoma and Nacogdoches bottling companies to switch brands. We therefore affirm the magistrate judge's grant of judgment as a matter of law in favor of Coca-Cola.

IV

A

Seven-Up next contends that the magistrate judge erred in denying its request for permanent injunctive relief prohibiting Coca-Cola from using "The Future Belongs to Sprite." We review a court's decision granting or denying permanent injunctive relief for abuse of discretion. *Peaches Entertainment Corp. v. Entertainment Repertoire Assoc., Inc.,* 62 F.3d 690, 693 (5th Cir.1995). Seven-Up argues that based on the judgment entered on the jury's finding that the Coca-Cola

---

[17]There was also testimony presented at trial that presentations had been made to Great Plains going back to 1986 in an attempt to convince the bottling company to introduce Sprite into their marketplace.

presentation was false and misleading, and was likely to deceive the independent bottlers, Seven-Up is entitled to permanent injunctive relief. In order to obtain permanent injunctive relief under a claim pursuant to § 43(a), a plaintiff must demonstrate that a commercial advertisement or promotion is either literally false or that the advertisement is likely to mislead and confuse consumers. *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.,* 938 F.2d 1544, 1548-49 (2d Cir.1991). In addition, however, a plaintiff must also show that it will suffer irreparable harm if the injunction is not granted. *Id.* at 1549. Having reviewed the record, we find no evidence that Seven-Up will suffer irreparable harm absent a permanent injunction against Coca-Cola's future use of "The Future Belongs to Sprite." Nothing in the record suggest that Coca-Cola has used the presentation since 1991, and moreover, we agree with the magistrate judge that the pre-1991 statistical data contained in presentation materials are of "questionable significance" today. *See Oil Heat Inst. of Oregon v. Northwest Natural Gas,* 708 F.Supp. 1118, 1122 (D.Or.1988) (holding request for injunctive relief moot where challenged documents were no longer being distributed). Accordingly, we find that the magistrate judge did not err in denying Seven-Up's request for permanent injunctive relief.

B

Seven-Up also contends that the magistrate judge erred in not awarding Seven-Up attorney fees. The Lanham Act provides that a court may award the prevailing party reasonable attorney fees in "exceptional cases." 15 U.S.C. § 1117. The prevailing party has the burden to demonstrate the exceptional nature of a case by clear and convincing evidence. *CJC Holdings, Inc. v. Wright & Lato, Inc.,* 979 F.2d 60, 65 (5th Cir.1992). The determination as to whether a case is exceptional is left to the sound discretion of the trial court. *Texas Pig Stands v. Hard Rock Cafe Intern.,* 951 F.2d 684, 696-97 (5th Cir.1992). An exceptional case is one where the violative acts can be characterized as "malicious," "fraudulent," "deliberate," or "willful." *Moore Business Forms, Inc. v. Ryu,* 960 F.2d 486, 491 (5th Cir.1992) (quoting the Act's legislative history). We have recognized that the statutory provision has been interpreted by the courts "to require a showing of a high degree of culpability on the part of the infringer, for example, bad faith or fraud," and a few cases have gone as far as to require "very egregious conduct" to constitute an "exceptional" case. *Texas Pig Stands,* 951 F.2d

at 696-97 & n. 25 (internal quotation marks omitted); *see also Moore Business Forms,* 960 F.2d at 491 & n. 2 (citing cases).

Applying *Texas Pig Stands* to this case, we conclude that the record does not support a finding of bad faith or fraud on the part of Coca-Cola. There is scant evidence in the record that Coca-Cola acted willfully or maliciously in creating the presentation materials. As the magistrate judge noted, none of Seven-Up's witnesses presented evidence that any of the "polling sources" had been rejected by the soft-drink industry for providing unreliable data, or that the polling methods used were unscientific or based upon statistically unreliable sampling methods. None of the witnesses presented any evidence that Coca-Cola had "doctored" or changed the results reported by the sources of the data, or that Coca-Cola misidentified the sources to whom the data was attributed. Rather, the evidence reflected that Seven-Up also relied on some of the same polling sources. We agree with the magistrate judge that although the jury found that the "conclusions and opinions" expressed by Coca-Cola, based on this statistical data, were false and misleading, this finding alone does not compel a finding that this case is "exceptional." Accordingly, we conclude that the magistrate judge did not abuse his discretion in denying Seven-Up's request for attorney fees.[18]

V

For the foregoing reasons, we AFFIRM.

---

[18]For the same reasons, we also find that the magistrate judge did not abuse his discretion in denying Seven-Up's request for its court costs. Seven-Up also appeals from the magistrate judge's denial of Seven-Up's request for prejudgment interest and treble damages. In light of our affirmance of the grant of judgment as a matter of law in favor of Coca-Cola, we also affirm the magistrate judge's denial of prejudgment interest and treble damages.