**FASHION BOUTIQUE OF SHORT HILLS, INC., Plaintiff,**

v.

**FENDI USA, INC. and Fendi Stores, Inc., Defendants.**

**No. 91 Civ. 4544 (MGC).**

United States District Court, S.D. New York.

Oct. 23, 1996.

---

Weil, Gotshal & Manges by Helene D. Jaffe, George F. Meierhofer and Stacey M. Berg, New York City, for Plaintiff.

Pavia & Harcourt by Steven Skulnik, Richard L. Mattiaccio and David A. Botwinik, New York City, for Defendants.

## OPINION

CEDARBAUM, District Judge.

What is the minimum activity required to constitute "advertising or promotion" within the meaning of the Lanham Act? That is the issue presented by this motion for partial summary judgment. Fashion Boutique of Short Hills, Inc. sues Fendi USA, Inc. and Fendi Stores, Inc. for unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1994), and for unfair competition and defamation under New York common law. Fashion Boutique alleges that defendants' employees made disparaging comments regarding the quality and authenticity of the goods sold by Fashion Boutique to consumers who visited defendants' store in New York. After I denied in relevant part defendants' motion to dismiss the complaint, *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, No. 91 Civ. 4544 (MGC), 1992 WL 170559 (S.D.N.Y. July 2, 1992), Fashion Boutique conducted extensive discovery. Fashion Boutique also sent undercover investigators to defendants' New York store. Defendants have now moved for partial summary judgment pursuant to Fed.R.Civ.P. 56 limited to the Lanham Act claim. For the reasons that follow, defendants' motion is granted.

## Undisputed Facts

From 1983 to July of 1991, Fashion Boutique operated a retail store in Short Hills, New Jersey, which sold only Fendi brand merchandise, including leather goods and furs. In August of 1988, Fashion Boutique and Fendi Diffusione Imp/Exp. s.r.l. entered into a written franchise agreement. The term of the franchise agreement was later extended, and limitations were placed on Fendi Diffusione's ability to sell Fendi products to certain retailers in New Jersey. (Defs.' 3(g) Statement ¶¶ 1, 5, 7; Pl.'s 3(g) Statement ¶¶ 1, 5, 7.)

Fashion Boutique purchased all of its goods from manufacturers within the Fendi organization and from affiliated licensees. In 1987, Manetti–Farrow was appointed to distribute a separate line of Fendi goods to department stores in the United States. Fashion Boutique continued to purchase its goods as it had previously. (Defs.' 3(g) Statement ¶¶ 1–2, 7; Pl.'s 3(g) Statement ¶¶ 1–2, 7.)

Fendi USA is a wholly-owned subsidiary of Fendi Diffusione, and Fendi Stores is a wholly-owned subsidiary of Fendi USA. On October 31, 1989, Fendi Stores opened a store on Fifth Avenue in New York City. When the New York store opened, a list of Fendi boutiques was displayed at the entrance. Fashion Boutique's Short Hills store was not included on the list. The New York store was promoted, in part, through public relations, advertising and direct mail. (Defs.' 3(g) Statement ¶¶ 3–4, 8–9, 13; Pl.'s 3(g) Statement ¶¶ 3–4, 8–9, 13.)

## Consumers

When the Short Hills store closed in July of 1991, it maintained a list of approximately 8,000 customer addresses. (Defs.' 3(g) Statement ¶ 29; Pl.'s 3(g) Statement ¶ 29; Skulnik Reply Aff., Ex. NN.)

Fashion Boutique has submitted declarations from fourteen people who visited the New York store before Fashion Boutique closed the Short Hills store. Four people were told that the Short Hills store sold a different line of Fendi products, although no reference was made to the quality of goods carried by the Short Hills store. (Marano Aff. ¶ 3; Mironov Decl. ¶ 3 [1]; Sala Decl. ¶ 2; Seldes Decl. ¶ 2.) Three of these people had come to the New York store for assistance with repairs of defective merchandise that had been purchased at the Short Hills store. (Marano Aff. ¶ 2; Mironov Decl. ¶ 2; Seldes Decl. ¶ 2.) Ten people were told that the Short Hills store carried a line of Fendi merchandise that was inferior to that carried by the New York store. (Amore Decl. ¶ 4; Bassett Decl. ¶¶ 3–5; Green Decl. ¶ 3; Lance Decl. ¶¶ 2–3; Mantel Aff. ¶ 3; C. Montalbano Decl. ¶¶ 4, 6; M. Montalbano Decl. ¶¶ 6, 8; Ray Decl. ¶ 4; Ring Decl. ¶¶ 3–4; Scheer Decl. ¶ 3.) Two people were told that the Short Hills store sold "fake" or "bogus" Fendi merchandise. (Lance Decl. ¶ 3; Ray Decl. ¶ 4.) One couple was told that the furs carried by the Short Hills store were old and not well made. (C. Montalbano Decl. ¶¶ 4, 6; M. Montalbano Decl. ¶¶ 6, 8.) Employees at the New York store encouraged three people to write letters to Fendi Stores complaining about the inferior goods sold at the Short Hills store. (Green Decl. ¶ 4; C. Montalbano Decl. ¶ 7; M. Montalbano Decl. ¶ 9.)

Bruce Blomquist testified at his deposition that when he visited the New York store in January of 1990, an employee told him that the Short Hills store carried a different line of merchandise. (Blomquist Dep. at 27.) The employee also told Blomquist, "I don't know what their quality is like out there [in Short Hills]." (*Id.*) When Blomquist visited the New York store later in 1990, a salesperson asked him where he had purchased his Fendi belt. When Blomquist told him that it had been purchased in Short Hills, the salesperson asked him, "[a]re you sure it is real?" The salesperson added, "[y]ou never know what kind of skins you get out there." (*Id.* at 28.)

One person who called the New York store in 1990 to complain about a repair that she

---

1. Judith Mironov went to the New York store "during the summer of 1991." (Mironov Decl. ¶ 2.) It is unclear whether she went before or after the Short Hills store closed in July of 1991. For the purpose of this motion, it is assumed that she went prior to the closing of the Short Hills store.

had taken to the Short Hills store was told that "a lot of people are calling and complaining, and a lot of people are writing letters." (Meierhofer Aff., Ex. 16 at 7.) She was encouraged to write a letter concerning her complaints about the Short Hills store. (*Id.*)

The majority of the declarations submitted by Fashion Boutique for the pre-July 1991 period are from people who heard rumors that the Fendi store in Short Hills sold "fake" Fendi merchandise. (B. Abdul–Oawi Decl. ¶ 2; S. Abdul–Oawi Decl. ¶ 2; Bright Decl. ¶ 2; Bressler Decl. ¶ 2; Crump Decl. ¶ 2; Faerberg Decl. ¶ 2; Hamilton Decl. ¶ 2; Harper Decl. ¶ 2; Jackson Decl. ¶ 2; Juman Decl. ¶ 2; Kenny Decl. ¶ 2; Miro Decl. ¶ 2; Pearce Decl. ¶ 2; Ray Decl. ¶ 7; Robinson Decl. ¶ 2; Strollo Decl. ¶ 2.) One declarant heard rumors that the Short Hills store carried fake Fendi merchandise, but could not remember when she had heard those rumors. (Giasullo Decl. ¶ 2.)

Fashion Boutique has also submitted eight declarations from people who visited or called the New York store after the Short Hills store closed. Three people were told that the Short Hills store had sold a line of merchandise different from that of the New York store, although no reference was made to the quality of goods formerly carried by the Short Hills store. (Farinella Decl. ¶ 2; Sinins Decl. ¶ 2; Stefanelli Decl. ¶ 3.) Three people were told that the Fendi store in Short Hills did not sell "real" Fendi or that it sold inferior goods. (Pellino Decl. ¶¶ 2–4; Romano Decl. ¶ 3; Van Strat Decl. ¶ 5.) One person was told by an employee of the New York store that the Short Hills store was closed because it was too costly to maintain, (Martino Decl. ¶ 3), and another was told that the Short Hills store was closed because "we've had a lot of problems with Fendi Short Hills." (Norcia Decl. ¶ 3). One person heard rumors after July of 1991 that the Short Hills store closed because it had sold "fake" Fendi merchandise. (Criscitello Decl. ¶ 2.)

*Undercover investigators*

Fashion Boutique sent nine different undercover investigators to the New York store on several occasions in 1990 and 1991. Usually, the undercover investigators brought a defective product that they said had been purchased at the Short Hills store and requested assistance with a repair. (*See* Meierhofer Aff., Ex. 15, Ex. A–E, H.) On three occasions, the undercover investigator complained about poor customer service at the Short Hills store. (*Id.* Ex. 15, Ex. A–C.)

On August 6, 1990, an undercover investigator brought a defective wallet which she said had been purchased at the Short Hills store. She complained that the merchandise at the Short Hills store was terrible and that the people at the Short Hills store were rude. (*Id.* Ex. 15, Ex. A at 1.) Francesco Gittardi, an employee of Fendi Stores, told the undercover investigator that the New York store did not carry that particular style of wallet because it was from an "American distribution" line. (*Id.* at 1–2.) Gittardi also told the undercover investigator that "some customers have some problems with Short Hills." (*Id.* at 3.)

On August 30, 1990, an undercover investigator brought a defective crocodile belt, which she said had been purchased at the Short Hills store, to the New York store for repair. She complained that the people at the Short Hills store had been very uncooperative. (*Id.* Ex. 15, Ex. B at 2.) Joanne Vernocchi, the customer service manager, told her that the belt was not real crocodile. (*Id.* at 2–3.) David Shreve, the manager for menswear, told her that the belt may be crocodile, but that it was not the same quality as crocodile sold in the New York store. (*Id.* at 10.) Shreve also noted that the Short Hills store had a reputation for being uncooperative and encouraged the undercover investigator to write a letter to Fendi Stores about the poor customer service at the Short Hills store. (*Id.* at 4, 7, 9.) On September 6, 1990, the same undercover investigator returned to the New York store with two other undercover investigators, complained again about the poor treatment she had received at the Short Hills store, and offered to write a letter of complaint. (*Id.* Ex. 15, Ex. C at 1, 4, 7.) Vernocchi told her that there had been a "lot of problems" with the Short Hills store and that the people at the Short Hills store were "rude to everybody." (*Id.* at 2, 6.) Vernocchi encouraged the undercover inves-

tigator to write a letter to Bruno D'Angelo, the Executive Vice President of Fendi Stores, and told her, "[t]he more juice you put in the letter, the better." (*Id.* at 2, 5.) Shreve also encouraged the undercover investigator to write a letter. (*Id.* at 7.)

On October 11, 1990, an undercover investigator brought a defective lizard cigarette case, which he said had been purchased at the Short Hills store, to the New York store for repair. (*Id.* Ex. 15, Ex. D at 1.) David Shreve told him that the New York store did not carry "this particular line." (*Id.* at 2.) He said that some of the merchandise carried by the Short Hills store was from a line manufactured by a different supplier. (*Id.* 3–4.) Shreve noted that although the quality of merchandise carried by the Short Hills store should be the same as the merchandise carried in the New York store, "unfortunately, it is not in some cases." (*Id.* at 3–4.) Shreve added that the Short Hills store also purchased merchandise from the same factories in Rome from which the New York store purchased merchandise, but that the stores did not always buy the same items. (*Id.* at 2, 4.) Shreve told the undercover investigator to take the case back to the Short Hills store, but warned him that he was "going to run into some problems with [Short Hills]." (*Id.* at 2–3.) When the undercover investigator returned the following day with another undercover investigator, he said that Shreve had told him that it would be difficult to return the case to the Short Hills store. (*Id.* Ex. 15, Ex. E at 2.) Vernocchi responded that there had been "a lot of problems with the Short Hills [store]," and that they were "trying to consolidate a lot of the complaints . . . so that we can present [them] to Fendi [Diffusione]." (*Id.* at 2–3.) Vernocchi added that the Short Hills store sold a "different line, more or less. They buy directly from Rome, but that doesn't mean . . . that ours is any better than theirs." (*Id.* at 4.)

On November 29, 1990, two undercover investigators visited the New York store to shop for fur coats. Jack Cohen, the managing director for furs, told them that all the furs at the Short Hills store were two years old and that the Short Hills store did not have any furs from the new collection. (*Id.*

Ex. 15, Ex. F at 2, 5.) He said that otherwise the Short Hills store was a good store. (*Id.* at 6.)

On December 19, 1990, an undercover investigator visited the New York store and sought assistance in identifying ties which his wife planned to purchase at the Short Hills store. Joanne Vernocchi told him that the New York store did not carry the same merchandise, but she added, "Fendi is Fendi. I'm not trying to distinguish one from the other." (*Id.* Ex. 15, Ex. G at 1.) She added that the Short Hills store was "known for giving people a hard time exchanging things and returning things," and that "so many people really don't have anything nice to say about them." (*Id.*) The undercover investigator volunteered that his aunt had trouble returning merchandise to the Short Hills store. (*Id.* at 2.)

On January 29, 1991, an undercover investigator brought a defective bag to the New York store for repair. She said it had been purchased at the Short Hills store during the previous summer. Robert King, an assistant store manager, told her that it was an "older bag" and that it was not part of the line that the New York store sold. (*Id.* Ex. 15, Ex. H at 1–2.)

On July 2, 1991, an undercover investigator brought a Fendi bag to the New York store. He told the salesperson, Grace Varella, that he wanted to buy a matching bag. Without knowing where the bag had been purchased, Varella told him that the bag was from the franchise line, which was not carried in the New York store. (*Id.* Ex. 15, Ex. I at 1–2.) At that point the undercover investigator told her that it had probably been purchased in New Jersey. (*Id.* at 2.) When asked whether they were "all the same goods," Varella responded affirmatively. (*Id.*)

After the Short Hills store closed, an undercover agent called the New York store and was told by King that the owners of the Short Hills store were filing for bankruptcy. (*Id.* Ex. 15, Ex. J at 6.)

*Caroline Clarke*

Caroline Clarke, former Director of Operations for Fendi Stores, Inc., testified at her deposition as follows:

Q: Do you recall what Mr. King told you concerning disparaging the Short Hills store?

A: Well, I don't recall specifics. I do recall—I do recall him telling me that customers would come into the store and that they would tell them of their—their bad experience at the Short Hills store, and they would say things like, "Oh, we are aware of this problem. You are not the first customer who said these things"— things of that nature.

Q: Do you know whether they would disparage the Short Hills store only in reaction to what a customer said?

A: I know Mr. [Arnold] Rubenstein [Fendi's first store manager] used to go further. He would tell them, "Yes, the Short Hills store is a horror. We know all about the problems. You shouldn't shop there anymore. You should come to Fendi New York."

Q: How do you know he said those things?

A: Because he told me he said those things....

Q: You are saying that it was the store policy to disparage the Short Hills store?

A: Yes....

Q: Are you aware of whether people disparaged the Short Hills store with regard to the quality of merchandise they carried or the selection or anything that related to customer service?

A: That I really don't know. Basically it was customer service.

(Clarke Dep. at 277, 279–80.)

*Johanna Thormann*

Johanna Thormann, a salesperson in the fur department at the New York store from 1992 to 1993, (after the Short Hills store had closed), testified that Cohen disparaged the quality of furs formerly carried by the Short Hills store. (Thormann Dep. at 102, 106, 139–40, 224.)

*Discussion*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment should be granted where the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986).

In deciding whether there is a genuine issue of material fact, the court must "examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *In re Chateaugay Corp.,* 10 F.3d 944, 957 (2d Cir.1993) (citation omitted). However, a party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir. 1986) (citation omitted), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

Section 43(a)(1)(B) of the Lanham Act provides, in relevant part:

Any person who, on or in connection with any goods or services, ..., uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any ..., false or misleading description of fact, or false or misleading representation of fact, which ... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of ... another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

Fashion Boutique argues that it has presented evidence that defendants' employees falsely represented to consumers: (1) that the Fendi goods sold by Fashion Boutique in Short Hills were inferior to the product line carried by the New York store; (2) that the goods sold by the Short Hills store were not authentic Fendi merchandise; and (3) that

the New York store had received numerous complaints about customer service at the Short Hills store.

Fashion Boutique has submitted evidence that, in the period prior to July of 1991 when it closed, a total of eleven consumers were told by defendants' employees that the Short Hills store carried inferior merchandise. (Amore Decl. ¶ 4; Bassett Decl. ¶¶ 3–5; Blomquist Dep. at 27; Green Decl. ¶ 3; Lance Decl. ¶¶ 2–3; Mantel Aff. ¶ 3; C. Montalbano Decl. ¶¶ 4, 6; M. Montalbano Decl. ¶¶ 6, 8; Ray Decl. ¶ 4; Ring Decl. ¶¶ 3–4; Scheer Decl. ¶ 3.) On four occasions, undercover investigators were told that the goods sold by the Short Hills store were not the same quality as the goods in the New York store. (Meierhofer Aff., Ex. 15, Ex. B at 2–3, 10; *id.* Ex. 15, Ex. D at 3–4; *id.* Ex. 15, Ex. F at 2, 5; *id.* Ex. 15, Ex. H at 1–2.) Three consumers were told that the Short Hills store sold "fake" or "bogus" Fendi merchandise. (Blomquist Dep. at 28; Lance Decl. ¶ 3; Ray Decl. ¶ 4.) One consumer was told that "a lot of people" were calling and writing to complain about customer service at the Short Hills store. (Meierhofer Aff., Ex. 16 at 7.) On three occasions when an undercover investigator complained about poor customer service at the Short Hills store, he or she was told that other people had similar complaints. (Meierhofer Aff., Ex. 15, Ex. A at 3; *id.* Ex. 15, Ex. B at 4, 7, 9; *id.* Ex. 15, Ex. C at 2, 6.) On three other occasions, undercover investigators were warned about poor customer service at the Short Hills store. (*Id.* Ex. 15, Ex. D at 2–3; *id.* Ex. 15, Ex. E at 2–3; *id.* Ex. 15, Ex. G at 2.)

None of the other evidence submitted by Fashion Boutique supports the allegation that defendants falsely disparaged the Short Hills store. Some of the allegedly false representations had nothing to do with the quality of the goods or customer service at Short Hills. (*E.g.,* Martino Decl. ¶ 3; Meierhofer Aff., Ex. 15, Ex. J. at 6.) On many occasions when consumers or undercover agents were told that the Short Hills store carried a different line of Fendi goods, no reference was made to the quality of the goods sold by the Short Hills store. Indeed, on three occasions, Fashion Boutique's undercover investi-

gators were told that the quality of the merchandise was the same in both the New York and Short Hills stores. (Meierhofer Aff., Ex. 15, Ex. E at 4; *id.* Ex. 15, Ex. G at 1; *id.* Ex. 15, Ex. I at 2.)

■ The declarations from people who heard "rumors" that the Short Hills store sold "fake" Fendi merchandise are not properly considered on a motion for summary judgment. Only "such facts as would be admissible in evidence" are properly so considered. Fed.R.Civ.P. 56(e); *see also Liberty Mut. Ins. Co. v. Rotches Pork Packers,* 969 F.2d 1384, 1388 (2d Cir.1992). Testimony about hearing rumors as evidence that defendants disparaged the quality of the goods sold by Fashion Boutique is inadmissible hearsay. *See* Fed.R.Evid. 802.

■ Nor do allegedly disparaging remarks made after the Short Hills store closed support a claim under the Lanham Act because at that point defendants were no longer competitors of the Short Hills store. In order to constitute "advertising or promotion" under section 43(a)(1)(B), the allegedly false representations must be made by someone who is in commercial competition with the plaintiff. *Gordon and Breach Science Publishers v. American Inst. of Physics,* 859 F.Supp. 1521, 1535–36 (S.D.N.Y. 1994); *see also Seven–Up Co. v. Coca–Cola Co.,* 86 F.3d 1379, 1384 (5th Cir.1996). Fashion Boutique has presented no evidence that it planned to re-open the Short Hills store or that comments by defendants' employees after July of 1991 prevented it from doing so.

■ The issue then is whether the admissible evidence is sufficient to withstand a motion for a directed verdict at trial on the question whether defendants engaged in "advertising or promotion" within the meaning of the Lanham Act. The Lanham Act does not define "advertising or promotion." The Act's legislative history is not helpful on this issue. The words of the statute, "advertising" and "promotion," connote reaching out to consumers. In modern jargon, these words connote proactive, not merely reactive, communication. Lanham Act "advertising or promotion" usually involves initiating notice to consumers, *see, e.g., Gordon and Breach*

*Science Publishers S.A. v. American Institute of Physics,* 905 F.Supp. 169, 181–82 (S.D.N.Y.1995); *H & R Indus., Inc. v. Kirshner,* 899 F.Supp. 995, 999–1000 (E.D.N.Y. 1995); *Mobius Management Sys. v. Fourth Dimension Software, Inc.,* 880 F.Supp. 1005, 1010–11 (S.D.N.Y.1994); *Williams Elec., Inc. v. Bally Mfg. Corp.,* 568 F.Supp. 1274, 1282–83 & n. 24 (N.D.Ill.1983), making a sales presentation, *see, e.g., Seven–Up Co.,* 86 F.3d at 1382; *Gordon and Breach Science Publishers, S.A.,* 905 F.Supp. at 180–81; or initiating conversations with consumers, *see, e.g., National Artists Management Co. v. Weaving,* 769 F.Supp. 1224, 1235 (S.D.N.Y.1991). Indeed, all of the cases relied on by plaintiff involved customer contacts that were actively sought by the defendant. There is no evidence in this case that defendants initiated communications about Fashion Boutique to any of Fashion Boutique's customers. On the contrary, the evidence shows that allegedly disparaging oral comments were made only to customers who visited the New York store and themselves initiated discussion of the Short Hills store.

■ In order to constitute "advertising or promotion" under section 43(a)(1)(B), the allegedly false representations must be disseminated sufficiently to the relevant purchasing public. *Gordon and Breach Science Publishers,* 859 F.Supp. at 1535–36; *see also Seven–Up,* 86 F.3d at 1384. The level of dissemination required to constitute advertising and promotion will vary from industry to industry and from case to case. *See American Needle & Novelty, Inc. v. Drew Pearson Mktg.,* 820 F.Supp. 1072, 1078 (N.D.Ill.1993).[2]

Fashion Boutique argues that a statement to one customer is sufficient to prove a claim under the Lanham Act. Most of the courts that have addressed this issue have held that dissemination to a single consumer is not sufficient. *Goldsmith v. Polygram Diversified Ventures, Inc.,* No. 94 Civ. 8888 (DLC), 1995 WL 614560, at *7–8 (S.D.N.Y. Oct. 19, 1995); *Garland Co. v. Ecology Roof Sys. Corp.,* 895 F.Supp. 274, 279 (D.Kan.1995); *American Needle & Novelty, Inc.,* 820

F.Supp. at 1078; *but see Gordon and Breach Science Publishers, S.A.,* 905 F.Supp. at 182 (The "breadth of dissemination, although important, is not dispositive."). *Mobius Management Sys.,* 880 F.Supp. 1005, cited by Fashion Boutique, is distinguishable. The court in *Mobius* found that "the relevant purchasing market [for report distribution system software for use on IBM mainframe computers] is quite small," and that the true relevant purchasing public in that case consisted of one consumer. *Id.* at 1020–21. Thus, the court held that a disparaging letter sent to that consumer made out a claim under the Lanham Act. *Id.*

In this case, the relevant purchasing public consists of thousands of consumers. After years of discovery, Fashion Boutique can show only that twelve customers and nine undercover investigators sent to instigate statements about the Short Hills store, heard defendants' employees make disparaging comments. This is not a case where the alleged misrepresentations reached a significant portion of a small purchasing public. *See Seven–Up Co.,* 86 F.3d at 1386–87 (allegedly false representations made to eleven of seventy-four members of relevant purchasing public states a claim under Lanham Act); *National Artists Management Co.,* 769 F.Supp. at 1235–36 (defendant's allegedly false representations to ten of plaintiff's thirty customers in an industry that is indisputably small and interconnected states a claim under Lanham Act).

Fashion Boutique argues that it was defendants' policy to disparage the Short Hills store. Fashion Boutique relies heavily on the testimony of Caroline Clarke to support this claim. However, Clarke testified that she did not know if defendants' employees disparaged the quality of Fashion Boutique's merchandise. (Clarke Dep. at 280.) She testified that it was defendants' policy to disparage the customer service provided by Short Hills. (*Id.*) As discussed above, Fashion Boutique's best evidence is that seven people, six of whom were undercover investigators, heard defendants' employees

---

**2.** Fashion Boutique cites *H & R Indus.,* 899 F.Supp. 995, for the proposition that the question of what constitutes "advertising and pro-

motion" should be reserved for the jury. However, dissemination was not at issue in *H & R Indus.*

make allegedly disparaging comments about customer service. This evidence does not prove that, as a result of defendants' policy, disparaging comments about customer service were sufficiently disseminated to the large relevant purchasing public. Nor is the fact that a handful of employees made disparaging comments to a small fraction of the relevant purchasing public evidence of a policy to disparage the quality or authenticity of the merchandise sold by Fashion Boutique. *Cf. Medical Graphics Corp. v. SensorMedics Corp.,* 872 F.Supp. 643, 650 (D.Minn.1994) (on motion for preliminary injunction, plaintiff failed to establish likelihood of success under Lanham Act where evidence showed that potential market is large and that only a handful of sales representatives made false representations).

In sum, in view of the large relevant purchasing public and the absence of the initiation by defendants of a single communication to the public, the conduct complained of does not constitute "advertising or promotion" within the meaning of the Lanham Act.

### Conclusion

For the foregoing reasons, defendants' motion for summary judgment on the Lanham Act claim is granted.

SO ORDERED.