THE DECORATIVE CENTER OF
HOUSTON, L.P., Plaintiff,

v.

DIRECT RESPONSE PUBLICATIONS,
INC., Defendant.

No. Civ.A. H–01–4069.

United States District Court,
S.D. Texas,
Houston Division.

April 30, 2003.

Robert O'Conor, Jr., Attorney at Law, Houston, TX, Donald A. Harwood, Jay B. Itkowitz, Itkowitz & HArwood, New York City, for Plaintiff.

Donald B. McFall, McFall Sherwood et al., Houston, TX, Darin Lee Brooks, Beirne Maynard, Houston, TX, for Defendant.

## MEMORANDUM AND ORDER

ATLAS, District Judge.

Several motions are pending before the Court in this commercial dispute. Plaintiff The Decorative Center of Houston, L.P. ("DCH" or "Plaintiff") has moved for partial summary judgment[1] and to strike the testimony of Dennis Arnie, Defendant's expert.[2] Defendant Direct Response Publications, Inc. ("Direct" or "Defendant") has moved for final summary judgment[3] and to exclude the testimony of Richard Bean, Plaintiff's expert.[4] The parties have responded and replied to the pending motions.[5] After reviewing the parties' submissions, the record, and the applicable authorities, the Court determines that there is no issue of material fact on DCH's breach of contract claim. The Court also concludes that there are no issues of material fact on DCH's Lanham Act, tortious interference with prospective business relationship, and unfair competition claims, and those claims must be dismissed.

## I. BACKGROUND FACTS

This case arises out of the alleged breach of contract and misleading business practices of Defendant Direct.[6] Plaintiff DCH is a Texas limited partnership that owns a building known as The Decorative Center (the "Building") in Houston, Texas, in which vendors in the interior decorating

---

1. Plaintiff's Motion for Partial Summary Judgment and Supporting Memorandum of Facts and Law [Doc. # 50].

2. Plaintiff's *Daubert* Motion [Doc. # 51].

3. Motion of Defendant Direct Response Publications, Inc. for Final Summary Judgment [Doc. # 55]; Brief of Defendant Direct Response Publications, Inc. in Support of its Motion for Final Summary Judgment and Motion to Exclude the Opinions and Testimony of Richard Bean ("Defendant's Brief) [Doc. # 56].

4. Motion of Defendant Direct Response Publications, Inc. to Exclude the Opinions and Testimony of Richard Bean [Doc. # 54].

5. Plaintiff's Response to Defendant's Motion for Final Judgment and Motion to Exclude the Opinions and Testimony of Richard Bean ("Plaintiff's Response") [Doc. # 65]; Reply Brief of Defendant Direct Response Publications, Inc. [Doc. # 68]; Supplement to Reply Brief of Defendant Direct Response Publications, Inc. [Doc. # 70].

6. The Court has federal question and diversity subject matter jurisdiction in this case. 28 U.S.C. §§ 1331 and 1332.

industry lease showrooms.[7] Direct is a design center directory publisher that, for two years prior to the events in dispute, printed a directory of the vendors in the Building, pursuant to a contract between Direct and the prior owner of the Building, Decorative Center Houston, Limited ("DCH Ltd.").

Until April 2001, DCH Ltd., a Texas limited partnership, owned the Building. In 1986, Siri Roark ("Roark") joined DCH Ltd. as Special Events Coordinator for the Building. Her title later changed to Marketing Director.

In 1986, Roark began a tenant directory, the *Decorative Center Houston Directory*. Eventually, the project became too time consuming and too large for Roark to handle on her own. She hired a company that is not a party to this action to publish the directory, and that publisher did so until 1998, when DCH Ltd. and that publisher terminated their agreement.

In 1999, DCH Ltd. entered into a Publishing Agreement with Direct to publish the *Decorative Center Houston Directory* for the years 2000, 2001, 2002, and 2003. Thereafter, Direct published the *Decorative Center Houston 2000 Directory* and the *Decorative Center Houston 2001 Directory*.

In approximately March of 2001, DCH Ltd. asked Direct to terminate the Publishing Agreement. DCH Ltd. did so because the Building was being purchased by DCH, the Plaintiff in this lawsuit and a separate entity from DCH Ltd. DCH in-sisted that DCH Ltd. cancel the Publishing Agreement and other marketing agreements.

In April 2001, DCH Ltd. and Direct executed a "Termination to Agreement" ("Termination Agreement"). Specifically, the Termination Agreement required DCH Ltd. to pay $85,000 to Direct. In addition, the Termination Agreement provided that:

> [Direct] will not publish the Decorative Center Houston 2002 and Decorative Center Houston 2003 directories and/or will not solicit tenants of the Decorative Center of Houston for advertising for the Decorative Center Houston 2002 and Decorative Center Houston 2003 directories.

Termination Agreement, ¶ 1.

A few days after the Termination Agreement was executed in April 2001, DRP solicited 56 of DCH's tenants for advertising. The solicitations asked the tenants to "update your information below" and stated "Our records currently show the following information."[8] The solicitations were for a *"Dallas/Houston Design To The Trade Directory."*[9]

Direct, through its President, Richard Joseph Giarratana, concedes that it also provided rate cards to the same 56 DCH tenants, although this rate card apparently was sent separate from the solicitation.[10] The rate card stated:

> *Dallas/Houston Design To The Trade* is the ultimate trade resource to the finest traditional and contemporary furnishings in the five-state region. More than

---

7. The vendors that lease space from DCH in the Building will be referred to as "tenants." DCH has approximately 131 tenants, 56 of which are apparently design vendors.

8. Appendix 8 to Plaintiff's Response.

9. *Id.*

10. Deposition of Richard Joseph Giarratana, 92–95 (Appendix to Plaintiff's Response). Direct argues that the Court should not consider this evidence because it was not asserted as a possible basis for false representations under the Lanham Act in previous pleadings. This argument is rejected. The Complaint is not required to contain every fact or piece of evidence that supports the claims.

350 Dallas/Houston-area showrooms and galleries, including the Decorative Center Dallas, Dallas Design Center, Dallas Market Center, Decorative Center Houston, are listed. *To The Trade* is undoubtedly the design professional's premier resource for furniture, fabrics, flooring, lighting, wall coverings, art antiques, kitchen and bath products, accessories and more.[11]

Direct also sent solicitations and rate cards to DCH tenants for a 2003 directory. The 2003 directory solicitations have the same language and Direct also mentions Decorative Center Houston on Direct's web site at <http://www.interiordesign-web.com/drp/rates/dal.html>. Direct did not inform Plaintiff's tenants in its solicitations or rate cards that its contract to publish the Building-sponsored *Decorative Center Houston Directory* had been terminated.

Siri Roark, DCH's Marketing Director, testifies that some DCH tenants who received the solicitation from Direct were confused that the solicitation was from Roark for the DCH Directory,[12] but identifies no specific tenants. In mid–2001, Roark sent a memo to DCH tenants clarifying that the Direct solicitation was not for the Building's own annual DCH Directory.[13]

Kim Mullen, building manager for DCH, also testifies that the information in the solicitation created confusion among tenants because it requested them to update their information and added that "Our records currently show the following information." [14] Mullen names four specific tenants and alludes to others that she cannot now remember who described being confused and not understanding that DCH's solicitation of advertising from them was different from Direct's solicitations.[15] She also testifies that it was difficult to sell advertising to the tenants for the Building-sponsored directory because of the competition from Direct Response.[16]

Alton LaDay, who took over from Siri Roark as Marketing Director in October 2001, also testifies that Direct's actions made it difficult for DCH to compete with Direct for advertising sales.[17] Bob Briddick, an employee of David Sutherland, Inc., a tenant in the Building, testifies that had he known that Direct Response was not publishing DCH's Directory for 2002, he would not have returned the completed solicitation form to Direct Response on behalf of his employer.[18]

After Direct sent its solicitations to DCH tenants, Direct published a *2002 Dallas/Houston Design To The Trade* market source book, which listed DCH Building tenants among many other tenants in other Houston and Dallas decorator buildings. Around the same time, DCH also published its own *Decorative Center Houston 2002 Directory*.

In 2002 and 2003 respectively, DCH sold only 30 and 32 advertisements for its own directory. This is a decline from 65 advertisements that were sold for the DCH

---

**11.** Appendix 20 to Plaintiff's Response, at 00010.

**12.** Deposition of Siri Roark, 57–59 (Appendix 6 to Plaintiff's Response).

**13.** *Id.*

**14.** Affidavit of Kim Mullen, ¶ 1 (Appendix 10 to Plaintiff's Response).

**15.** *Id.,* ¶ 2.

**16.** *Id.,* ¶ 3.

**17.** Affidavit of Alton LaDay, ¶ 5 (Appendix 12 to Plaintiff's Response).

**18.** Affidavit of Bob Briddick, ¶ 5 (Appendix 8 to Plaintiff's Response).

Directory in 2001 when Direct was the publisher.

DCH alleges that Direct's solicitations misled the Building's tenants into believing that they were being offered a renewal of their listing in the DCH Directory, and not a new listing in a separate two-city directory published solely by Direct. In other words, DCH's essential contention is that its tenants were misled into believing that Direct's directory was authorized by the Building owners as the *Decorative Center Houston Directory* had been in the two preceding years. In this lawsuit, DCH alleges causes of action under the Lanham Act for both money damages and injunctive relief, breach of contract, tortious interference with prospective business relationships, and unfair competition. Direct has moved for summary judgment on all causes of action. DCH has moved for summary judgment only on its breach of contract claim.

## II. *SUMMARY JUDGMENT STANDARDS*

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir.2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is enti-

tled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir.2002). An issue is material if its resolution could affect the outcome of the action. *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 310 (5th Cir.2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In deciding whether a fact issue has been created, the facts and the inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Hotard v. State Farm Fire & Cas. Co.*, 286 F.3d 814, 817 (5th Cir.2002). However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy—that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir.1999).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. *Smith v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir.1998). The movant meets this initial burden by showing that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial." *Id.* If the movant meets this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir.2001) (quoting *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir.1998)). A dispute over a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* (quoting

*Smith v. Brenoettsy,* 158 F.3d 908, 911 (5th Cir.1998)); *see also Quorum Health Resources, L.L.C. v. Maverick County Hosp. District,* 308 F.3d 451, 458 (5th Cir.2002).

The nonmovant's burden is not met by mere reliance on the allegations or denials in the nonmovant's pleadings. *See Morris v. Covan Worldwide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir.1998). Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not meet this burden. *Id.* Instead, the nonmoving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Id.* In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.,* 66 F.3d 89, 92 (5th Cir.1995), *revised on other grounds upon denial of reh'g,* 70 F.3d 26 (5th Cir.1995); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).

## III. *ANALYSIS*

### A. *Breach of Contract Claim*

DCH sues for breach of the Termination Agreement. DCH has moved for summary judgment on its breach of contract claim requesting that the Court rule that Direct materially breached the Termination Agreement, that damages of $85,000 must be paid by Direct to DCH, and that Direct must pay attorneys' fees to DCH. Direct has a cross-motion for summary judgment asking the Court to dismiss DCH's contract claim on several grounds.

### 1. Standing

■ Direct first contends that DCH does not have "standing" to sue for breach of the Termination Agreement because DCH is not a party to the Termination Agreement. DCH counters that it has standing to sue because DCH Ltd. assigned the Termination Agreement to DCH, because DCH qualifies as a successor or assign under the terms of the Termination Agreement, and/or because DCH was a third-party beneficiary under the Termination Agreement. The Court does not address all of these arguments because the Court concludes that the recent assignment of rights under the Termination Agreement from DCH Ltd. to DCH confers on DCH the right to maintain this suit for breach of contract.

On January 21, 2003, DCH Ltd. "sold, assigned, transferred and delivered" to DCH all of DCH Ltd.'s right, title and interest in and to the Termination Agreement (the "Assignment").[19] The Assignment purports to be effective as of the date the Termination Agreement was originally executed.

■ Direct's chief objection to the Assignment is its tardiness. The Assignment was executed over a year after the lawsuit was filed, also after the discovery period, and after Direct filed its motion for summary judgment. Direct argues that a party cannot cure a standing defect by subsequent assignment, citing language from this Court concerning the possible amendment of a licensing agreement to save a patent lawsuit, *Duratherm, Inc. v. Onsite Technology LLC,* 141 F.Supp.2d 657, 660 (S.D.Tex.2001) (quoting *Enzo APA & Son, Inc. v. Geapag A.G.,* 134 F.3d 1090, 1093 (Fed.Cir.1998)). The cited authority is not probative in this case. *Duratherm* was a patent infringement suit. Federal patent claims are governed by their own unique sets of rules and precedents. Direct has

---

**19.** Appendix 27 to Defendant's Brief.

cited no Texas common law or statutes supporting its argument that the limiting principle in *Duratherm* applies to a common law breach of contract action.[20] Indeed, there is no apparent prejudice to Direct arising from the timing of the assignment. The assignee, DCH, is the real party in interest and can maintain the action. *See Dubuque Stone Products Co. v. Fred L. Gray Co.*, 356 F.2d 718, 724 (8th Cir.1966).

Direct also argues that the Court should not allow DCH to sue because DCH has never pleaded assignment as a basis for its standing to sue under the Termination Agreement.[21] Direct quotes language from *Johnson v. City of Dallas, Tex.*, 61 F.3d 442, 444 (5th Cir.1995) (quoting *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)), that suggests that DCH is required to plead the fact of an assignment in the complaint. However, a close review of the opinion in *Johnson* reveals that the court considered all factual matters of record on appeal to determine standing, not just the complaint. *Johnson* thus merely requires that the facts supporting standing appear affirmatively in the record. Most significantly, Direct has been on notice of DCH's claims throughout this suit, and DCH's recent cure of the technical defect works no unfair prejudice.[22] Although DCH did not specifically plead the assignment, DCH did plead in its Complaint that it is a successor in interest to DCH Ltd. and that DCH Ltd. was DCH's predecessor in interest.[23] Here, DCH supplied the assignment to Direct shortly after it was signed, and has argued its significance to the Court in a sufficiently timely manner. There is no basis to disallow the Assignment or to exclude it from evidence, as Direct requests. DCH has standing to assert this breach of contract claim.

## 2. Ambiguity

■ Direct also makes several arguments concerning the interpretation of the termination Agreement. Both parties have moved for summary judgment on DCH's breach of contract claim. In its Memorandum and Order dated June 12, 2002, the Court held that Paragraph 1 of

20. DCH also cites § 12.014 of the Texas Property Code to support its position. Section 12.014 provides that an interest in a cause of action on which suit has been filed may be sold, regardless of whether the judgment or cause of action is assignable in law or equity, if the transfer is in writing. Direct objects to this citation, arguing that § 12.014 contemplates assignments during the course of a lawsuit by parties in the lawsuit. Defendant's Reply, at 8 (citing *River Consulting, Inc. v. Sullivan*, 848 S.W.2d 165 (Tex.App.-Houston [1st Dist.] 1992, writ denied) and *Bay Ridge Utility Dist. v. 4M Laundry*, 717 S.W.2d 92 (Tex.App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.)). Direct argues that these cases illustrate that DCH's theory under § 12.014 would work if the party who has standing, DCH Ltd., were a party to the lawsuit. The Court agrees with Direct that § 12.014 does not apply to this case, but for a reason different from what Direct suggests. Section 12.014 concerns assignments of causes of action and judgments. Here, the assignment was of "right, title and interest in and to the 'Termination to Agreement'...." Thus, the assignment was an assignment of contractual rights, not a cause of action or a judgment, and Tex. Prop.Code § 12.014 has no apparent bearing on the question at hand.

21. Defendant's Brief, at 26 (citing *Johnson v. City of Dallas, Tex.*, 61 F.3d 442, 444 (5th Cir.1995)) (quoting *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)).

22. If *Johnson* were construed to require that all the facts supporting standing be pleaded in the complaint, the Court, in the interest of justice, would allow DCH to file a supplement to the Complaint, pursuant to Federal Rule of Civil Procedure 15(d), to include the fact of the recent assignment.

23. Complaint, at 2.

the Termination Agreement was ambiguous as a matter of law.

In a "whereas clause" of the Termination Agreement, the titles of the parties' anticipated joint publications for 2000, 2001, 2002 and 2003, respectively, were described as the "Decorative Center Houston 2000 Directory," "Decorative Center Houston 2001 Directory," etc. The parties then employed the shorter phrase "Decorative Center Houston 2002 and Decorative Center Houston 2003 directories" in paragraph 1, the provision cancelling the Publishing Agreement. From a review of the Termination Agreement itself, it is impossible to tell if the phrase in issue ("Decorative Center Houston 2002 and Decorative Center Houston 2003 directories") was merely a short-hand plural reference to the two specific publications the parties originally planned for the years 2002 and 2003 (*i.e.,* the "Decorative Center Houston 2002 Directory" and the "Decorative Center Houston 2003 Directory,"... ), *or* if the phrase referred to generic directories of the Building tenants that Direct might publish in 2002 and 2003.... This ambiguity most likely will need to be addressed at trial.

Memorandum and Order [Doc. # 34], at 22.

■ Although construction of an ambiguous contract generally presents a question of fact, making summary judgment improper, **undisputed** parol evidence can be used to resolve an ambiguity as a matter of law. *See Winslow v. Acker,* 781 S.W.2d 322, 325 (Tex.App.—San Antonio 1989, writ denied); *Security Savings Ass'n*

*v. Clifton,* 755 S.W.2d 925, 931 (Tex.App.-Dallas 1988, no writ) (citing *Harris v. Rowe,* 593 S.W.2d 303, 306 (Tex.1979); *Noble v. Hunter,* 441 S.W.2d 580, 583 (Tex. Civ.App.-Amarillo 1969, no writ)). Direct now asks the Court to employ this process. The Court concludes that the undisputed parol evidence in this case resolves as a matter of law the issue of a potential ambiguity in the Termination Agreement. The uncontradicted extrinsic evidence shows that when the parties signed the Termination Agreement, the phrase "Decorative Center Houston 2002 and Decorative Center Houston 2003 directories" in Paragraph 1 was a shorthand plural reference to the two specific DCH-sponsored Building directories the parties originally planned Direct to publish for DCH for the years 2002 and 2003.

■ Tracy Underwood, who drafted the Termination Agreement on behalf of DCH Ltd. and communicated with Giarratana concerning the agreement, testified in her deposition that when she referred to the "Decorative Center Houston 2002 and Decorative Center Houston 2003 directories" in Paragraph 1, she was referring to the two publications that Direct was under obligation in its contract to publish for the years 2002 and 2003.[24] She also answers affirmatively in her deposition that in writing "little D, directories," she was simply using the plural form of *Decorative Center Houston 2002 [2003] Directory* that she used in the previous "whereas" paragraph.[25] These statements constitute admissions of a party-opponent under Federal Rules of Evidence 801(d)(2)(A), (C), and (D). DCH is bound by Underwood's depo-

---

**24.** Deposition of Tracy Underwood, at 6–7 (Appendix 4 to Defendant's Brief).

**25.** *Id.* at 7. Underwood also testified that the distinction between the uppercase "D" that is used in the "whereas" paragraph and the

lowercase "d" that she used in Paragraph 1 did not enter her mind and that she did not place any significance on the use of the uppercase "D" or the lowercase "d." *Id.* at 7, 13.

sition testimony in which she expressly stated her intent about words she actually drafted and agreed to in Paragraph 1, which words became the binding language in the parties' contract.[26] This interpretation is consistent with the one Direct advocates. Thus, there is no material question of fact about the meaning of the phrase in Paragraph 1 the Court originally believed was ambiguous. The provision, as drafted, covers the specific DCH-sponsored Building directories for 2002 and 2003.

 DCH has not produced admissible evidence that the parties' agreement, as written, prohibits Direct from creating any directories that list the Building's tenants or contain advertising referencing these tenants' Houston addresses and related information.[27] To interpret the contract language, the Court may not rely on the parties' differing recollections or interpretations of their pre-contract negotiations.[28] Underwood's explanation of her reasoning in pre-contract negotiations[29] thus is inadmissible. DCH's arguments are, at best, an attempt through parol evidence to create an ambiguity or to vary the terms of the parties' written agreement.[30] Because Underwood's testimony

26. DCH attempts to rely on Underwood's earlier affidavit testimony that it was her "understanding and intention that Direct Response Publications, Inc. would be prohibited from contacting and soliciting advertising for a Houston design directory from Decorative Center of Houston tenants for 2002 or 2003." Underwood Aff., at 1–2. Underwood, however, gave unequivocal, more specific testimony in a deposition, which is binding on DCH, as described above.

27. Underwood also testified that she did not think of the possibility that Direct might publish a directory covering all the showrooms in Dallas and Houston. *See* Deposition of Tracy Underwood (Appendix 2 to Plaintiff's Response), at 86. Thus, DCH's belated contentions Paragraph 1 was to cover such eventuality are not supported by Underwood's testimony. For the same reason, the anti-solicitation provision in Paragraph 1 is limited to a prohibition against Direct's solicitation for the DCH-sponsored Building directory, based on Underwood's own explanation of her intent in drafting the provision. DCH is bound by its agent's admissions.

28. Thus, the testimony from Giarratana about earlier draft language for that paragraph that Underwood proposed, but that Giarratana rejected is inadmissible. Deposition of Richard Giarratana, at 67–68, 98–100, 122–23 (Appendix 6 to Defendant's Brief). In this connection, Direct also offers evidence of an earlier draft of Paragraph 1 that read "DRP will not publish *publications related to* the Decorative Center Houston 2002 and Decorative Center

Houston 2003 directories...." Deposition of Tracy Underwood, at 93–94 (Appendix 3 to Defendant's Brief). The parties agree that Giarratana rejected the inclusion of the "publications related to" language.

29. Underwood testifies that the insertion of the words "publications related to" in Paragraph 1 meant to her that Direct would not publish directories "relating" to the Decorative Center of Houston (*i.e.*, the Building) for 2002 and 2003. Deposition of Tracy Underwood, at 93–94 (Appendix 3 to Defendant's Brief). She explained that when Giarratana expressed concerns about the implications of Paragraph 1 with those three words, Underwood removed them, but she took the three words out to ease Giarratana's concerns about other directories, specifically a directory he was under contract to publish for the Decorative Center Dallas, although she was not aware that he had a directory called *Dallas Design [To] The Trade*, which later became *Dallas/Houston Design To The Trade*. *Id.* at 67–69; *see also* Affidavit of Tracy A. Underwood ("Underwood Aff."), at 1 (Appendix 7 to Plaintiff's Response).

30. If the terms of the contract can be given a definite or certain legal meaning, then the contract is not ambiguous. *H.E. Butt Grocery Co. v. National Union Fire Ins. Co.*, 150 F.3d 526, 529 (5th Cir.1998); *National Union Fire Ins. Co. v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex.1995). The Court may not consider parol evidence for the purpose of creating an ambiguity. *National Union*, 907 S.W.2d at 520. The parol evidence rule also

unequivocally establishes—consistent with Direct's position—that the Termination Agreement language in Paragraph 1 addressed only the DCH-sponsored *Decorative Center Houston 2002 Directory* (and the Building directory for 2003), there is no support for DCH's argument that creates an ambiguity in Paragraph 1 of the Termination Agreement [31] and no genuine question of fact about the meaning of the words the parties adopted in their contract.[32] The Court will use this interpretation to assess DCH's arguments about Direct's alleged breach of that agreement.[33]

### 3. Breach

The Court must determine whether there is any issue of material fact concerning Direct's alleged breach of the Termination Agreement. The elements in a suit for breach of contract are: (1) a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff was damaged as a result of the breach. *Taub v. Houston Pipeline Co.*, 75 S.W.3d 606, 615 (Tex.App.-Texarkana 2002, pet. denied); *Guzman v. Ugly Duckling Car Sales of Texas, L.L.P.*, 63 S.W.3d 522, 528 (Tex.App.-San Antonio 2001, pet. denied); *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 593 (Tex.App.-Houston [14th Dist.] 2000, no pet.). A breach occurs when a party fails or refuses to do something he has promised to do. *Townewest Homeowners Ass'n, Inc. v. Warner Communication Inc.*, 826 S.W.2d 638, 640 (Tex.App.-Houston [14th Dist.] 1992, no writ); *Intermedics, Inc. v. Grady*, 683 S.W.2d 842, 845 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.). "Reliance is not required to prove a breach of contract." *Nat'l W. Life Ins. Co. v. Rowe*, 86 S.W.3d 285, 297 (Tex. App.-Austin 2002, pet. filed). There is no dispute that DCH paid $85,000 to Direct under the Termination Agreement, in exchange for which Direct agreed to give up its rights to publish the next two years DCH-sponsored Building directories.

The Court concludes that there is no issue of material fact as to breach of this agreement. Paragraph 1 of the Termination Agreement provides:

> [Direct] will not publish the Decorative Center Houston 2002 and Decorative Center Houston 2003 directories and/or

---

precludes consideration of extrinsic evidence that contradicts, varies, or adds to the terms of an unambiguous written agreement. *Zapata Co. Appraisal Dist. v. Coastal Oil & Gas Corp.*, 90 S.W.3d 847, 852 (Tex.App.San Antonio 2002, pet. denied).

31. Direct also argues that the term "tenants" in the Termination Agreement is unambiguous as a matter of law. This appears to be a preemptive argument in response to attempts by DCH in discovery to include manufacturers not tenants of DCH as people who were confused by Direct's solicitations. The Court agrees that "tenants" refers solely to occupants of DCH's Houston Building.

32. In addition, the parties evidenced their agreement to make the Termination Agreement the final word by including in it a merger clause providing that the Termination Agreement supersedes all prior agreements.

That provision states: "This Amendment represents the entire agreement of the parties regarding the matters set forth herein, and all prior agreements with respect to such matters, whether written or oral, are merged herein."

33. In her affidavit, Underwood references a letter she wrote to Direct *after* they contacted tenants and solicited advertising from them, stating that such solicitation was in direct violation of Paragraph 1 of the Termination Agreement. *Id.* at 2 and Exhibit B to Underwood Aff. This testimony about Underwood's post-contract actions are not material in light of her uncontroverted testimony that, when she wrote the phrase "Decorative Center Houston 2002 and Decorative Center Houston 2003 directories," she referred in plural form to the specific 2002 and 2003 directories that Direct was obligated to publish under the Publishing Agreement.

will not solicit tenants of the Decorative Center of Houston for advertising for the Decorative Center Houston 2002 and Decorative Center Houston 2003 directories.

As noted earlier, "Decorative Center Houston 2002 and Decorative Center Houston 2003 directories" means the DCH-sponsored *Decorative Center Houston 2002 Directory* and the DCH-sponsored *Decorative Center 2003 Directory,* each of which Direct was obligated to publish for DCH under the Publishing Agreement. Paragraph 1 prevents Direct from publishing specifically those two directories and from soliciting tenants of the Building for information and advertising for those two directories. The evidence is undisputed that Direct did not publish a directory or solicit advertising for either of these directories. Rather, Direct solicited for a directory covering hundreds of design companies that officed in one of ten buildings, two in Houston and eight in Dallas, one of which Houston locations was DCH's Building.

DCH argues that the *Dallas/Houston Design To The Trade* satisfies the definition of "Decorative Center Houston 2002 [or 2003] Directory" language in Paragraph 1.[34] The Court may look to the factual circumstances under which the parties entered into the Termination Agreement, *i.e.,* the parties' original Publishing Agreement and the actual 2001 and 2000 DCH-sponsored Building directories, to determine whether there is a genuine issue of material fact that publication of or solicitation for the *Dallas/Houston Design To The Trade 2002* (or its 2003 successor) constituted a breach of the prohibitions in Paragraph 1 of the Termination Agreement.[35]

The Publishing Agreement outlined several requirements for the *Decorative Center Houston Directory.* DCH agreed that it would use the publication as its official showroom directory and granted Direct the authority to use DCH's name and logo in the directory and in advertising sales promotional materials.[36] Under the Publishing Agreement, Direct could not include advertising from persons or companies other than DCH tenants, represented manufacturer lines, and businesses and vendors related to DCH.[37] In addition, DCH had the right to edit and approve drafts of the directory.[38] DCH also had full ownership and copyright of the directories upon delivery to DCH offices.[39] The Publishing Agreement required that *Decorative Center Houston Directory* contain specific sections called "Showrooms," "Manufacturers," and "Products."[40] Direct was to conduct a survey of each showroom for the purpose of these sections.[41] In addition, the *Decorative Center Houston Directory* was to include other materi-

---

34. For ease of reference, the Court discusses primarily the 2001 and 2002 publications of the parties. The parties present very little evidence about the later directories, and legally the same analysis applies to the parties' 2003 versions of their respective publications.

35. The Termination Agreement superseded the Publishing Agreement entirely. See Termination Agreement, ¶ 3 (merger clause). Nevertheless, it is impossible to ascertain the meaning of the terms in the later agreement without referring to the earlier one as background.

36. Publishing Agreement, ¶¶ 1 and 3.

37. *Id.,* ¶ 4.

38. *Id.,* ¶¶ 6–7, Exhibits A and B.

39. *Id.,* ¶ 10.

40. *Id.,* ¶ 6.

41. *Id.*

al provided by DCH, such as an "Information" section including but not limited to "Welcome," "How to Find," "Admissions Policy," Organizations," "Calendar of Events," "Industry Markets," "Hours of Operation," and "Administrative Staff," which related only to Houston, the Building, and/or its tenants.[42] The "Table of Contents" page was required to include certain publishing information and limitations on reproduction.[43] Only DCH tenants were permitted to advertised in the *Decorative Center Houston Directory.*

While the *Dallas/Houston Design To The Trade* is similar in certain respects to the DCH-sponsored *Decorative Center Houston Directory,* Direct's publication is not merely a copy of the DCH-sponsored directory. Direct's *Dallas/Houston Design To The Trade* has a different name that prominently conveys that this publication encompasses businesses in all interior design buildings in the two major Texas areas, not merely one building in Houston. *Dallas/Houston Design To The Trade* contains listings for businesses in ten different buildings. The "welcome page" in *Dallas/Houston Design To The Trade* explains that the 2002 version "now incorporates the Houston design community as well" as the Dallas showrooms. The focus is the eight extensive Dallas-area buildings and showrooms, which indices are listed in the volume prior to the DCH Building tenants' listing. Further, Direct's publication covers businesses in another Houston building occupied by numerous interior design companies, the "Houston Resource Center." Unlike DCH's officially sponsored Building directory, which had DCH's logo on the cover, *Dallas/Houston Design To The Trade* does not purport to be endorsed by DCH or any other building owner.

By way of background, irrespective of the Publishing Agreement or the Termination Agreement, the vast majority of DCH Building tenants' addresses and phone numbers are publicly available through the phone book, if not elsewhere.[44] The parties' directories both list this publicly available information at no charge. Similarly, they include information, such as product lines and hours of operation, which they solicit individually from the showrooms. However, there appears to be no charge to include this information in the competing directories. In reality, this dispute concerns the advertising that the tenants are encouraged to purchase.

To the extent the *Dallas/Houston Design To The Trade* includes information that was also included in the *Decorative Center Houston Directory,* such as information on the hours of operation of the DCH tenants' showrooms, manufacturers, and product lists, the similarities are not proprietary to DCH, a landlord. It is in the showrooms' interest to obtain free listings of this information and DCH has not shown that the tenants would resist providing this information to any publication available to the design trade. The similarities between the competing directories' tables of contents (about which DCH also complains) arise from the relatively limited universe of data the parties respectively collected. A table of contents, per se, is a feature typically included in any multi-page book. DCH has no viable claim that such an idea was unique to its Building directory. That various publicly available calendars, lists of design trade organizations, or other indices or advertisements for Houston vendors appear in both vol-

---

42. *Id.*

43. *Id.*

44. The tenants not listed are basically showrooms that sell a variety of manufacturers' wares.

umes also is not evidence sufficient to support a verdict that Direct's *Dallas/Houston Design To The Trade* is a breach of the Termination Agreement. This publication is simply insufficiently similar to the DCH-sponsored single-building directory to violate the prohibition in Paragraph 1 of the Termination Agreement.

This conclusion is bolstered by the fact that Direct sold paid advertising for its *2002 Dallas/Houston Design To The Trade* only to companies that had Dallas showrooms, who decided to advertise their Houston locations in DCH's Building[45] The fact that companies chose to list both their Dallas and Houston locations in their advertising does not evidence a material breach of the Termination Agreement by Direct.

In a further attempt to raise a fact issue on breach of Paragraph 1 of the Termination Agreement, DCH points to Direct's solicitations of listings and advertising from DCH tenants using ambiguous language and a reference to the Building's name "Decorative Center Houston," in its rate card sent to 56 tenants for *Dallas/Houston Design To The Trade* and in Direct's website.[46] DCH also complains that Direct did not inform Plaintiff's tenants in its solicitations or rate cards that its right to publish the Decorative Center Houston Directory had been terminated.[47] Direct's solicitations only violate the Termination Agreement *if* the solicitation was for a publication that was prohibited under that contract.[48] The fact that there may have been potential confusion among certain DCH Building tenants does not establish a material breach of the agreement. DCH is bound to the terms of Paragraph 1 as to what Direct could or could not publish.[49] Because the similarities between the parties' publications are insufficient to render the *Dallas/Houston 2002 Design To The Trade* a violation of the agreement that Direct would not to publish a DCH-sponsored Building directory, DCH has failed to adduce evidence that Direct breached Paragraph 1 of the Termination Agreement by soliciting for its Dallas/Houston publication. DCH seeks to hold Direct to a contract provision to which Direct did not agree, *i.e.*, a commit-

---

**45.** Giarratana Depo., at 104–05 (Appendix 6 to Defendant's Brief).

**46.** Deposition of Tracy Underwood, at 85–86 (Appendix 2 to Plaintiff's Response).

**47.** Giarratana admits that he did not have permission to use Decorative Center Houston's name on the rate cards. Deposition of Richard Giarratana ("Giarratana Depo."), at 95 (Appendix 4 to Plaintiff's Response).

**48.** Underwood states that she knew that Giarratana published a directory for the Decorative Center Dallas. Deposition of Tracy Underwood, at 69–70 (Appendix 2 to Plaintiff's Response). Had Underwood wanted to preclude Direct's solicitation of the Building's tenants for all purposes, she should have insisted on the necessary language in the contract. It is not material that she now claims that she was not aware of *Dallas Design [To] the Trade* or any other book that Giarratana published in Dallas, *id.*, and that it did not occur to her that Giarratana would do any publications for Houston. *Id.* at 69–70 and 86.

**49.** DCH complains that, by including the "Decorative Center Houston" in its rate cards to each of the DCH tenants that Direct solicited, Direct effectively created the *Decorative Center Houston 2002 Directory* when it produced the *2002 Dallas/Houston To The Trade* directory. Giarratana admits that he derives benefit from having Decorative Center Houston listed in the *Dallas/Houston Design to the Trade* because "our book, point blank, based on being a comprehensive source of information for the whole market, without that building it would not be a comprehensive source." Giarratana Depo., at 131 (Appendix 4 to Plaintiff's Response). However, the potential confusion is not relevant here. This evidence will be addressed in connection with DCH's Langham Act claim.

ment not to publish a directory "related" to DCH's tenants or "similar to" the DCH-sponsored directory. The language to which DCH agreed, and accordingly the right DCH actually obtained, was far more restricted that DCH may have sought.[50] The Court concludes that there is no genuine issue of fact that Direct's *Dallas/Houston Design to the Trade* breached its obligations under Paragraph 1 of the Termination Agreement not to publish DCH's *Decorative Center Houston Directory* for 2002 and 2003. DCH's breach of contract claim must be dismissed.

### B. *Lanham Act Claims*

Plaintiff alleges that Direct "has engaged in false advertising, including false designation of origin and affiliation, under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)." [51] Because only Direct has moved for summary judgment on the Lanham Act claim, the Court views the facts in the light most favorable to DCH, the non-moving party.

■ Direct asks the Court to determine whether DCH has asserted both a false advertising claim and a false designation of origin claim, or simply asserted one claim. Given DCH's inclusion of both "false advertising" and "false designation of origin" in its Complaint, DCH may rely on either theory at its option.

### 1. Legal Standards

Section 1125(a)(1) provides, in pertinent part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any work, term, name, symbol, or device, or

any combination thereof, or any false designation of origin, any false or misleading description or any false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

\* \* \* \* \* \*

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

■ The elements of a false advertising or false designation of origin claim under 15 U.S.C. § 1125(a)(1) are:

(1) the defendant made a false statement of fact about its product in a commercial advertisement;

(2) the statement actually deceived or had a tendency to deceive a substantial segment of its audience;

(3) the deception was material, in that it is likely to influence the purchasing decision;

(4) the defendant caused the false statement to enter interstate commerce; and

(5) the plaintiff has been or is likely to be injured as a result.

---

**50.** The Court, despite its sympathies that DCH paid Direct $85,000 under the Termination Agreement, must enforce the contract as written, despite a potential imbalance regarding the consideration Direct received. It

is not for the Court to weigh the fairness of consideration of an enforceable contract.

**51.** Complaint, at 6, ¶ 23; *id* at 8, ¶ 31.

*Logan v. Burgers Ozark Country Cured Hams Inc.,* 263 F.3d 447, 462 (5th Cir. 2001) (referring to § 1125(a)(1)(A)); *Pizza Hut, Inc. v. Papa John's Int'l, Inc.,* 227 F.3d 489, 495 (5th Cir.2000) (construing § 1125(a)(1)(B)); *King v. Ames,* 179 F.3d 370, 373–74 (5th Cir.1999) (referring to § 1125(a)(1)(A)).

Although the Court suggested in its June 12, 2002 Memorandum and Order that there was an open question as to the elements of a false designation of origin claim in the Fifth Circuit, the Court now concludes that the Fifth Circuit would apply the elements listed here.[52] These are the elements that the Fifth Circuit repeatedly has used for Lanham Act claims under § 1125(a), and the Court sees no basis to distinguish the elements applicable to false designation of origin claims from the elements used in the line of § 1125(a) Lanham Act claims cases in the Fifth Circuit. *See Logan,* 263 F.3d at 462; *Pizza Hut,* 227 F.3d at 495; *King,* 179 F.3d at 373–74.

■ Misleading statements may be actionable if consumers are actually deceived. "Representations are not shielded from condemnation under [the Lanham Act] simply because they are literally true. The Act's proscriptions against false representation reaches 'innuendo, indirect intimations, and ambiguous suggestions evidenced by the consuming public's misapprehension of the hard facts underlining an advertisement ... as well as blatant falsehoods.' " *Better Business Bureau v. Medical Directors, Inc.,* 681 F.2d 397, 400 (5th Cir.1982) (quoting *Vidal Sassoon, Inc. v. Bristol–Myers Co.,* 661 F.2d 272, 277 (2d Cir.1981)); *accord William H. Morris Co. v. Group W., Inc.,* 66 F.3d 255, 257–58 (9th Cir.1995).

■ Plaintiffs looking to recover monetary damages for false or misleading advertising that is not literally false must prove actual deception. *Pizza Hut, Inc.,* 227 F.3d at 497. "Plaintiffs attempting to prove actual deception have to produce evidence of actual consumer reaction to the challenged advertising or surveys showing that a substantial number of consumers were actually misled by the advertisements." *Id.*

■ Plaintiffs seeking injunctive relief must prove that the defendant's representations have a tendency to deceive consumers. *Id.* Although this standard requires less proof than actual deception, for injunctive claims, plaintiffs still must produce evidence that the advertisement

**52.** *See* June 12, 2002 Memorandum and Order, at 16–19. On reflection, the Court concludes that the Sixth and Seventh Circuits' tests for a false designation of origin claim are not consistent with the tight requirements imposed so far by the Fifth Circuit. The Court finds unworkable the Seventh Circuit's three element test that (1) the defendant used in connection with trade a false designation of origin or false description or representation; (2) the defendant caused such goods and services to enter into commerce; and (3) the plaintiff is a person who believes that he or she is likely to be damaged as a result. *Web Printing Controls Co., Inc. v. Oxy–Dry Corp.,* 906 F.2d 1202, 1204 (7th Cir.1990)); *accord, Kennedy v. Nat'l Juvenile Detention Ass'n,* 187 F.3d 690, 695–96 (7th Cir.1999); *1st National Reserve, L.C. v. Vaughan,* 931 F.Supp. 463, 466 n. 4 (E.D.Tex.1996)). Similarly, the Sixth Circuit's two-part test for false designation of origin (that "(1) the false designation must have a substantial economic effect on interstate commerce; and (2) the false designation must create a likelihood of confusion." *Murray Hill Publications, Inc. v. ABC Communications, Inc.,* 264 F.3d 622, 634 (6th Cir. 2001); *Chain, L.P. v. Tropodyne Corp.,* 225 F.3d 659, 2000 WL 712379, *3 (6th Cir.2000) (unpublished); *Johnson v. Jones,* 149 F.3d 494, 502 (6th Cir.1998) ("description of origin will be considered false if it creates a likelihood of confusion in the consuming public").), appears incomplete in light of the Fifth Circuit's approach.

tends to deceive consumers. *Id.* (citing *Coca–Cola Co. v. Tropicana Prod., Inc.,* 690 F.2d 312, 317 (2d Cir.1982)). To prove a tendency to deceive, a plaintiff needs to show that at least some consumers were confused by the advertisements. *Id.* at 498. "In order to obtain permanent injunctive relief against future violations of 15 U.S.C. § 1125(a), a plaintiff must 'demonstrate that a commercial advertisement or promotion is either literally false or that the advertisement is likely to mislead and confuse consumers' and 'that it will suffer irreparable harm if the injunction is not granted.'" *Logan,* 263 F.3d at 465 (quoting *Seven–Up v. Coca–Cola Co.,* 86 F.3d 1379, 1390 (5th Cir.1996)).[53]

■ Where a plaintiff who has brought a Lanham Act claim for false advertising has failed to present evidence that the defendant benefitted from the alleged false advertising, the plaintiff will not be permitted to recover any of the defendant's profits under 15 U.S.C. § 1117(a). *Logan,* 263 F.3d at 465.

### 2. Analysis

■ The statements on which DCH relies were not actually false, but arguably were misleading. Therefore, DCH must produce evidence of actual consumer reaction to the challenged advertising or surveys showing that a substantial number of consumers were actually misled by the advertisements. *See Pizza Hut,* 227 F.3d at 497. DCH also must produce evidence that the misrepresentations likely influenced purchasing decisions and that DCH has been injured as a result. DCH has not produced evidence sufficient to raise an issue of material fact on these essential elements of its Lanham Act claim.

Specifically, DCH has not shown any probative evidence suggesting that Direct's allegedly misleading advertisements influenced purchasing decisions or that a substantial number of consumers were actually misled by Direct's solicitations. Despite passage of more than a year since it learned about the offending conduct, DCH produced absolutely no direct evidence that the alleged deception likely influenced any of its tenants' purchasing decisions. There is no evidence from a tenant suggesting that it intended to purchase an advertisement for DCH's Building-sponsored directory, rather than an ad in the combined directory *2002 Dallas/Houston Design To The Trade* or that publication for 2003.

■ DCH points to its evidence about seven persons or entities that allegedly were deceived or confused by Direct's actions. Three of these, Grange Furniture, Boyd Levinson (now apparently ID Designs), and George Cameron Nash, are mentioned only in Kim Mullen's affidavit and then only in a conclusory fashion. These statements by Ms. Mullen are hearsay and inadmissible. DCH offers no first-hand evidence from individuals at these companies that their purchasing decisions were influenced by Direct's solicitations. Kim Mullen's conclusory and second-hand statement that the people at these businesses had difficulty understanding the difference between Direct's and DCH's solicitation of advertising does not constitute admissible or probative evidence that these companies' purchasing decisions were influenced.[54]

---

**53.** A district court's denial of a request for injunctive relief under the Lanham Act is reviewed for abuse of discretion. *Logan,* 263 F.3d at 465.

**54.** In fact, Grange Furniture purchased advertising in both the *2002 Decorative Center Houston Directory* and in *2002 Dallas/Houston To The Trade.* There is no evidence as to what influence, if any, Direct's statements'

DCH referred to four other individuals in its interrogatory answers in support of the concept of customer confusion.[55] The first individual is Bob Briddick ("Briddick") of David Sutherland, Inc., who stated that he would not have returned Direct's solicitation form if he had known that it was not for the DCH Directory. Yet Briddick admitted in his testimony at the preliminary injunction hearing in this case that the form he sent back was for a complimentary listing, not paid advertising.[56] Briddick also testifies—even more importantly—that David Sutherland in Dallas, not Briddick, made the decisions concerning whether to purchase paid advertising in the directories.[57] Interestingly, contrary to DCH's arguments, David Sutherland purchased an advertisement in Plaintiff DCH's *2002 Decorative Center Houston Directory*.[58] Moreover, Alton. LaDay ("LaDay"), DCH Marketing Director, admits that David Sutherland's six advertisements in *2002 Dallas/Houston Design To The Trade* were purchased by manufacturers on behalf of David Sutherland, not by the David Sutherland showroom itself.[59] Thus, DCH's evidence concerning Briddick is not probative of confusion that influenced a buying decision.

DCH also relies on an interrogatory answer that three additional individuals were confused and that their purchasing decisions were influenced. This information is inadmissible hearsay. The interrogatories were answered by Charles Cohen of DCH, by Alton LaDay, and by DCH's attorney, and were verified by Charles Cohen. This interrogatory response is not evidence from, let alone sworn testimony of, any of the allegedly confused and deceived individuals. Even if admissible, the evidence would be marginal in utility. LaDay admits that of these remaining three individuals, two (Kristine Dempster[60] of Kravet/Lee Jofa and Jack Fields[61] of Edward Fields) purchased the same number of ads from DCH and Direct in 2002, and one (M & M Carpets) purchased ads from neither Direct nor DCH in 2002. Thus, DCH has produced

had on the other two entities' purchasing decisions. Direct, not DCH, mentions the fact that Boyd Levinson (now ID Designs) purchased an ad in 2002 *Dallas/Houston Deisgn To The Trade* but not the *2002 Decorative Center Houston Directory*. However, there is no evidence as to why this company made the decision that it did. Standing alone, this evidence is insufficient to support the inference necessary to DCH's Lanham Act claim.

55. Plaintiff's Answers to Defendant's First Set of Interrogatories, at 3–4 (Appendix 13 to Defendant's Brief); Plaintiff's First Supplemental Answers to Defendant's First Set of Interrogatories, at 3–5 (Appendix 14 to Defendant's Brief).

56. Transcript [Doc. # 24], at 50–51.

57. *Id.* at 45–46.

58. Deposition of Alton LaDay, at 89 (Appendix 9 to Defendant's Brief).

59. *Id.* at 160.

60. The interrogatory answer states that Kristine Dempster expressed confusion about the directory solicitation made by Direct and thought the solicitations were for the DCH Directory. However, there is no evidence that this influenced her purchasing decision. Plaintiff's First Supplemental Answers to Defendant's First Set of Interrogatories, at 4. According to Alton LaDay's Deposition, Kristine Dempster was allegedly confused in both 2002 and 2003. Deposition of Alton LaDay, 82–83 (Appendix 23 to Plaintiff's Response).

61. The interrogatory answer states that Jack Fields thought that he had already purchased a DCH advertisement when he was approached by DCH to purchase advertisements, but that in fact he had purchased a Direct-solicited ad. Plaintiff's First Supplemental Answers to Defendant's First Set of Interrogatories, at 4.

no testimony or indication from any of its tenants that Direct's alleged deception influenced their purchasing decisions.[62]

DCH alternatively relies on the drop in gross number of advertisements for the DCH-sponsored Building directory after Direct terminated the Publishing Agreement, *i.e.* a comparison between the number of ads sold in 2001 and 2002, to show injury. This proof is unavailing, however. DCH provides no evidence that this decline occurred as a result of Direct's actions. DCH merely references generally that 56 of its tenants were solicited. Even if the Court were to accept as admissible evidence DCH's hearsay assertions that several individuals were confused and deceived, DCH has not produced any evidence that this alleged confusion was the reason that the tenants did not advertise in the *2002 Decorative Center Houston Directory*. What DCH relies on as putative circumstantial evidence, in fact is sheer speculation. Without admissible evidence from witnesses with personal knowledge, DCH has failed to demonstrate a question of material fact that its Building tenants relied on Direct's alleged misleading representations in their advertising purchasing decisions. Indeed, DCH ignores substantial probative evidence that suggests alternative reasons for the drop

in DCH's ad sales, such as the 85% increased cost of DCH's advertising in 2002 over the rates charged by Direct in 2001.[63]

The Fifth Circuit has addressed the issue of causation in a false advertising case in *Seven–Up Co. v. Coca–Cola Co.*, 86 F.3d 1379 (5th Cir.1996). In *Seven–Up*, Coca–Cola allegedly made false representations in sales presentations to eleven soft drink bottlers to induce them to switch from bottling Seven–Up to Sprite. Five of the bottlers thereafter switched to Sprite, and a jury found that the Coca–Cola sale presentations caused two of the bottlers to switch. The Fifth Circuit held that there was insufficient evidence for the jury to conclude that the false representations were a substantial factor causing the bottlers to switch brands. The Fifth Circuit rejected an inference of causation based solely on the chronology of events. Seven–Up did not present any direct evidence that even a single board member of either bottling company relied on or was influenced by any of the material in the presentation in deciding to switch to Sprite. In addition, there was testimony at trial regarding various market conditions bearing on the decision to switch from Seven–Up to Sprite, such as declining sales of Seven–Up and the financial condition of the Seven–Up company. Accordingly, the Fifth

---

**62.** DCH argues that it cannot afford to authorize a systematic investigation that demonstrates why every one of its tenants and the designer lines they represent made the advertising decisions they made. Nevertheless, DCH is obligated to produce at least *some* evidence that the alleged confusion likely influenced purchasing decisions. LaDay contends from "second hand knowledge" that additional tenants were confused, but does not identify any additional names. LaDay Depo., at 82–85 (Appendix 9 to Defendant's Brief). Roark testifies that she knew of no one that was actually deceived into purchasing an ad for the *2002 Dallas/Houston Design To The Trade* Directory believing that they were purchasing an ad for the *Decorative Cen-*

*ter Houston 2002 Directory.* Roark Depo., at 64 (Appendix 5 to Defendant's Brief).

**63.** The Court notes further that, had it been necessary to reach the issue of admissibility of the testimony of Dr. Richard Bean, DCH's expert on damages, the Court would hold that his opinions are inadmissible. Dr. Bean (who revised his conclusions several times) purports to opine on the amount of damages DCH allegedly suffered. His opinions thus are not relevant to the causation issue. His damages opinions amount to mere speculation based on insufficient or erroneous factual data, and thus are unreliable and irrelevant. *See* FED.R.EVID. 702.

Circuit held that when viewed against such a general context, an inference of causation based merely on the chronology of events was not a reasonable one for the jury to make. *Id.* at 1389–90. Here, DCH's evidence, based on tenuous inferences, is similarly insufficient.

Accordingly, the Court concludes that DCH has not raised an issue of material fact sufficient to survive a summary judgment motion on its Lanham Act claim.

### C. *Tortious Interference with Prospective Business Relationships Claim*

■■■■ The elements of a Tortious Interference with Prospective Business Relationships ("TIPBR") claim are: (1) a reasonable probability that the plaintiff would have entered into a business relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or the defendant knew that the interference was certain or substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm or damages as a result of the defendant's interference. *Baty v. Protech Ins. Agency,* 63 S.W.3d 841, 860 (Tex.App.-Houston [14th Dist.] 2001, pet denied). Interference is intentional if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result. But, if the actor had no desire to effectuate the interference by his action but knew that it would be an incidental result of conduct he was engaging in for another purpose, the interference may be found to be not improper. *Id.* (citing *Bradford v. Vento* 48 S.W.3d 749, 757 (Tex. 2001)). Conduct that is merely sharp or unfair is not actionable and cannot be the basis for an action for tortious interference

with prospective relations. *Wal–Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 726 (Tex.2001).

■■■■ DCH has failed to raise an issue of material fact as to Direct's alleged tortious interference with DCH's prospective business relationships. First, DCH has not raised an issue of material fact that Direct committed an independently tortious or unlawful act. DCH alleges that Direct's Lanham Act violation of sending the solicitation to "update" information constitutes an independently unlawful and tortious act. However, the Court has held that Direct does not have a viable Lanham Act claim.

In addition, DCH has not raised an issue of material fact suggesting that Direct acted with a conscious desire to prevent the contractual relationship for advertising between DCH and any tenant from occurring. Nor has DCH adduced evidence that Direct knew that its interference was certain or substantially certain to occur as a result of its creation of its multicity *Dallas/Houston Design To The Trade* publications. Therefore, DCH's TIPBR claim fails.

### D. *Unfair Competition Claim*

■■■■ DCH has also failed to establish an issue of material fact as to its unfair competition claim under Texas law. In Texas, a claim for unfair competition "is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." *Taylor Publishing Co. v. Jostens, Inc.,* 216 F.3d 465, 486 (5th Cir.2000) (quoting *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.,* 494 F.2d 3, 14 (5th Cir.1974)); *accord, United States Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.,* 865 S.W.2d 214, 217 (Tex.App.-Waco 1993, writ denied). "The

tort [of unfair competition] requires that the plaintiff show an illegal act by the defendant which interfered with the plaintiff's ability to conduct its business." *Taylor Publishing*, 216 F.3d at 486 (citing *Schoellkopf v. Pledger*, 778 S.W.2d 897, 904–05 (Tex.App.-Dallas 1989, writ denied)). "Although the illegal act need not necessarily violate criminal law, it must at least be an independent tort." *Id.*

■ Here, the "illegal act" DCH intends to invoke is Direct's alleged Lanham Act violation. However, since DCH does not have a valid Lanham Act claim, the underpinning of DCH's unfair competition claim is missing. DCH has not created an issue of material fact that Direct committed an illegal act that interfered with DCH's ability to conduct its business. The Court therefore dismisses DCH's unfair competition claim.

## IV. *CONCLUSION*

The Court concludes that there is no issue of material fact that Direct breached the parties' Termination Agreement under the language agreed to by DCH. also has failed to demonstrate issues of material fact to support its lost profits damage claim. In addition, there are no issues of material fact as to whether Direct violated the Lanham Act, committed tortious interference with prospective business relationships, or committed common law unfair competition. The Court also strikes as irrelevant Plaintiff's motion to exclude Dennis Arnie's opinions.[64] It is therefore

**ORDERED** that Plaintiff's Motion for Partial Summary Judgment and Support-

ing Memorandum of Facts and Law [Doc. # 50] is **DENIED**. It is further

**ORDERED** that the Motion of Defendant Direct Response Publications, Inc. for Final Summary Judgment [Doc. # 55] is **GRANTED**. It is further

**ORDERED** that Plaintiff's *Daubert* Motion [Doc. # 51] is **DENIED as moot**. It is further

**ORDERED** that the Motion of Defendant Direct Response Publications, Inc. to Exclude the Opinions and Testimony of Richard Bean [Doc. # 54] is **DENIED as moot.**

The Court will enter a separate final judgment.

---

64. Direct has also objected to affidavit testimony from Charles Cohen, Alton LaDay, Kim Mullen, and Richard Bean. *See* Objections of Defendant Direct Response Publications, Inc. to Plaintiff's Summary Judgment Affidavit Testimony [Doc. # 69]. The Court has ad-

dressed these various objections to the extent necessary throughout the opinion. The Court has not addressed the objections when the particular affidavit statements were not relied upon by the Court in its analysis.